Filed 4/7/16  Mulitz v. L.A. Stucco, Inc. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| LAURA MULITZ et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> L.A. STUCCO, INC., <br><br> Defendant; <br><br> UNITED SPECIALTY INSURANCE CO., <br><br> Intervener and Appellant. | B260314 c/w B262387 <br> (Los Angeles County Super. Ct. No. BC485588) |

APPEAL from a judgment and orders of the Superior Court of Los Angeles County.  Barbara A. Meiers, Judge.  Affirmed.

Archer Norris, W. Eric Blumhardt and Namvar A. Mokri for Intervener and Appellant.

Weintraub Tobin Chediak Coleman Grodin, Marvin Gelfand and Brittany J. Shugart for Plaintiffs and Respondents.

Gaglione, Dolan & Kaplan and Jeffrey S. Kaplan for Defendant.

In the underlying action, respondents Laura and Tom Mulitz asserted claims against L.A. Stucco, Inc. (L.A. Stucco) and respondent Building Dreams Construction, Inc. (Building Dreams), alleging that they renovated a home in a defective manner.[1]  Appellant United Specialty Insurance Company (United) intervened in the action as L.A. Stucco's insurer.  After initiating a cross-action against L.A. Stucco for indemnity and breach of contract, Building Dreams entered into a settlement with the Mulitzes stating Building Dream's intention to assign its cross-claims to them.  Following a jury trial, the court entered a judgment in favor of the Mulitzes against L.A. Stucco, issued contract-based attorney fee awards to the Mulitzes, and denied United's request for a contract-based award of attorney fees as the prevailing party on Building Dreams's cross-complaint.

United has appealed from the judgment and fee award rulings, contending the trial court erred in finding the Mulitzes to be third party beneficiaries of Building Dreams's contract with L.A. Stucco, declining to apply the economic loss rule to the Mulitzes' negligence claim, limiting the testimony of United's expert, and denying United's attorney fee request.  We reject United's contentions, and affirm the judgment and fee award rulings.

---

[1]     Because the Mulitzes share a surname, we generally refer to them by their first names.

2

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. *Events Preceding Action*

The underlying action concerns a house located on Hercules Drive in Los Angeles. Laura lives in the house, which is owned by the S.A.G.M. Trust. Laura is the trust's grantor and beneficiary, and her mother Shelley Mulitz is its trustee. The trust bought the house with funds provided by Laura.

In April 2010, Laura's stepfather Tom entered into a construction contract with Building Dreams to repair and remodel the house. Building Dreams, acting as general contractor, engaged L.A. Stucco as a subcontractor to apply new stucco to the house.

### B. *Complaints and Settlement*

In May 2012, Laura and Tom initiated the underlying action against Building Dreams and L.A. Stucco.[2] Their complaint alleged that the stucco work performed on the house was defective, and contained claims for negligence and breach of contract. Among those claims was a cause of action predicated on allegations that L.A. Stucco violated its contract with Building Dreams, which had been made "for the benefit of" Laura and Tom. Building Dreams filed a cross-complaint against L.A. Stucco, asserting claims for declaratory relief, equitable contribution, and indemnity.

---

[2]     The complaint also named as defendants Daniel Batres and Daniel Fitzgerald, who were identified as "principal[s]" of, respectively, Building Dreams and L.A. Stucco.

3

In September 2012, United sought to intervene in the action on the ground that it had issued commercial general liability policies to L.A. Stucco, which was then a dissolved corporation. The trial court granted United leave to intervene on behalf of L.A. Stucco as defendant and cross-defendant.

In March 2013, Shelley Mulitz, as trustee of the S.A.G.M. Trust, assigned to Laura and Tom "all of the claims and rights that . . . the [t]rust[] . . . would and does otherwise have against any party with respect to the construction, remodeling, and any other work performed at [the house]."

In July 2013, Building Dreams filed a first amended cross-complaint against L.A. Stucco, to which United filed an answer. The complaint asserted a claim for breach of contract, along with claims for declaratory relief, equitable contribution, and indemnity.

Shortly before trial, Laura and Tom entered into a settlement with Building Dreams.[3] Under the terms of the settlement, Building Dreams stated that it "will assign" to Laura and Tom all its claims against L.A. Stucco and United, including those asserted in the first amended cross-complaint. On July 18, 2014, the trial court found that the settlement had been made in good faith (Code Civ. Proc., § 877.6).

C. *Trial*

During his opening statement, United's counsel informed the jury: "L.A Stucco doesn't dispute that it did a really bad job . . . , and we don't dispute that [the Mulitzes] are in fact entitled to damages for our poor work. . . . [¶] So the issue that's going to be before you . . . is what are [the Mulitzes] entitled to . . . ."

---

[3]    Daniel Batres was also a party to the settlement.

4

### 1. *Laura and Tom's Evidence*

Laura pursues a career as a professional entertainer under a stage name. Tom, who has worked as a building contractor, assisted her in finding a suitable house to purchase. Laura provided the funds used to buy the house, and established the trust to hold it in order to enhance her safety and security.

Before Laura moved into the house, Tom noticed that it needed repairs. In February 2010, shortly after the house was purchased, Tom discussed renovations to the house with Building Dreams, including redoing the stucco, which exhibited cracking. According to Laura, in working with Building Dreams, Tom "basically did everything for her" because she knew nothing regarding construction. When Tom entered into an oral agreement with Building Dreams to perform the renovations, Laura funded the project.

Daniel Batres, a project manager for Building Dreams, testified that after he agreed to renovate Laura's house, L.A. Stucco submitted a $44,000 bid to Building Dreams to perform the stucco work on the house. Building Dreams and L.A. Stucco executed a written contract dated April 15, 2010 regarding the work. According to Batres, L.A. Stucco's scope of work required it to sandblast existing stucco down to the house's original stucco, apply new stucco, and install moldings around windows in order to "tie in" the new stucco. In addition, L.A. Stucco was to repair water stains under a balcony.

Tom testified that a few months after the completion of work, significant cracking and "ballooning" appeared in the new stucco, and pieces of stucco began falling off the house. Tom asked Building Dreams and L.A. Stucco to resolve the problems, but was dissatisfied with their proposals to cure the defects in the new stucco. He hired Michael Roberts to examine L.A. Stucco's work, and later engaged McCormick Construction to replace it. The repairs required Laura to

move out of the house into a rented residence and store her furniture and belongings. Her rent and moving expenses totaled approximately $131,000.

Roberts, a plastering and stucco expert, testified regarding the features of properly applied stucco and the defects in L.A. Stucco's work. According to Roberts, the term "stucco" refers to a system involving three bonded layers of plaster: a foundational "'scratch coat'" on lath wire affixed to a wall, an intermediate "'brown coat,'" and a "'finish coat.'" Underlying the scratch coat is a layer of building paper, which renders the system water-resistant. Water penetrates the plaster but is blocked by the building paper, which forces it to flow down and exit the system through a "weep screed."

At Tom's invitation, Roberts investigated L.A. Stucco's work on the house. According to Roberts, L.A. Stucco applied the new stucco in a manner that was never "advisable." He discovered that L.A. Stucco had sandblasted away only the existing finish coat, and applied an excessively thick three-layer stucco system to the original brown coat. That coat could not bear the weight of the new stucco, which "delaminat[ed]," cracked, and fell off the house. In addition, L.A. Stucco had conducted the sandblasting in an inadequate manner, resulting in "huge divots and pockets" in the original brown coat.

Roberts also found water intrusion inside the house at least partially attributable to L.A. Stucco's work. That intrusion was located at a sliding door, around some windows, and near a balcony. Regarding the sliding door, Roberts concluded that L.A. Stucco had improperly attached lath wire to the original stucco with concrete nails, which penetrated the original stucco and caused water intrusion. According to Roberts, the nails "went through the stucco system and through the black building paper, which was the weather-resistant barrier . . . ." Regarding the windows, he determined that L.A. Stucco had not remediated

6

excessive cracking in the original stucco, and instead applied new stucco over those cracks. Roberts stated: "If you're doing a system correctly, water should not be penetrating it . . . ." Regarding the balcony, Roberts stated that although the water intrusion probably predated L.A. Stucco's work, its system ought to have resolved the problem.

Roberts opined that it was necessary to "remove[] and replace[] the entire stucco system" due to the holes in the building paper below the stucco. He rejected an alternative method of repair called the "omega system," which involves the application of special materials over the existing stucco. According to Roberts, the omega system is intended solely to remediate cracking, and is "not designed to weatherproof a house." He asserted that using the omega system would have violated the applicable building code, which requires exterior openings exposed to the weather to be weatherproofed.

Roberts further testified that he recommended to Tom that Laura vacate the house until repairs could be completed. According to Roberts, the potential for falling stucco then rendered the house unsafe, and the necessary repairs would render it uninhabitable.

Steven McCormick, a principal of McCormick Construction, described the repairs McCormick Construction performed on the house, and provided expert testimony regarding the damage to the house from L.A. Stucco's work. McCormick found that L.A. Stucco had driven concrete nails through the "flashing" around windows and doors -- which provides waterproofing in those areas -- and thus had put holes in the house's "waterproof membrane." According to McCormick, absent that membrane's "solid integrity," application of the omega method to the house would not stop water leaks. The scope of the repair work undertaken by McCormick Construction included removing and replacing the

house's stucco system, as well as the flashing surrounding 28 windows and 5 sliding doors. McCormick Construction was paid $364,359 to remediate L.A. Stucco's work.

### 2. *United's Evidence*

West Harrington, a stucco expert, opined that the cracking in L.A. Stucco's work was due to its failure to prepare the underlying surface and use a bonding agent. He further opined that those defects caused no damage to other parts of the house, asserting that L.A. Stucco appropriately used concrete nails around the windows and doors. According to Harrington, such nails would not create water intrusion, even though they penetrated the house's water-resistant barrier. Harrington further testified that the scope of L.A. Stucco's work did not include repairs to existing water leaks, and that its application of a new stucco system was not intended to eliminate any such leaks. He maintained that the defects in L.A. Stucco's work would have been appropriately remediated by the application of an omega system, at an estimated cost of $116,547.

### 3. *Verdict*

Following the presentation of evidence at trial, the court dismissed Building Dreams's first amended cross-complaint. The jury returned special verdicts in favor of Laura and Tom on their claims for negligence and breach of contract, and found that they had suffered $403,827 in damages.

### D. *Judgment and Post-Judgment Rulings*

On September 16, 2014, the trial court entered a judgment in favor of Laura and Tom and against L.A. Stucco awarding $403,827, less a setoff of $110,000

8

reflecting prior settlements. Laura and Tom sought an award of contractual attorney fees pursuant to a fee provision in the contract between Building Dreams and L.A. Stucco, and United filed a motion for a new trial. After denying the new trial motion, the court granted Laura and Tom a fee award of $516,725, and a supplemental $49,100 award reflecting fees incurred in litigating the post-judgment matters. The court also denied United's request for an award of contractual attorney fees as the prevailing party with respect to Buildings Dreams's cross-complaint against L.A. Stucco. United noticed appeals from the judgment and post-judgment rulings, which were consolidated.

## DISCUSSION

United contends (1) that Laura and Tom's breach of contract claim and fee request were fatally defective because they were not third party beneficiaries of the contract between Building Dreams and L.A. Stucco, (2) that the economic loss rule barred the recovery of damages under their negligence claim, (3) that the trial court erroneously limited its expert Harrington's testimony, and (4) that L.A. Stucco was entitled to a fee award as the prevailing party on Building Dreams's cross-complaint. For the reasons discussed below, we reject those contentions.

### A. *Third Party Beneficiaries*

United asserts several contentions linked to a common theme, namely, that Laura and Tom were not third party beneficiaries of the contract between Building Dreams and L.A. Stucco. As Laura and Tom entered into a pre-trial settlement with Building Dreams, the breach of contract claim they litigated at trial was predicated on the contract between Building Dreams and L.A. Stucco, to which the Mulitzes were not signatories. United challenges that claim, arguing that Laura

9

and Tom were neither third party beneficiaries of the pertinent contract nor assignees of a tenable breach of contract claim possessed by the S.A.G.M. Trust. On similar grounds, United argues that the attorney fee provision in the contract supported no fee award to Laura and Tom.

### 1. *Governing Principles*

United's contentions implicate the principles applicable to third party beneficiaries, the ownership interests in a trust, and the assignment of claims. Civil Code section 1559 provides: "A contract, made expressly for the benefit of a third person, may be enforced by him [or her] at any time before the parties thereto rescind it." Here, "''[e]xpressly,' . . . means "in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.'" [Citations.] "[A]n intent to make the obligation inure to the benefit of the third party must have been clearly manifested by the contracting parties.'" [Citation.] Although this means persons only incidentally or remotely benefited by the contract are not entitled to enforce it, it does not mean both of the contracting parties must intend to benefit the third party: Rather, it means the promisor . . . 'must have understood that the promisee . . . had such intent. [Citations.] No specific manifestation by the promisor of an intent to benefit the third person is required.' [Citations.]" (*Schauer v. Mandarin Gems of Cal. Inc.* (2005) 125 Cal.App.4th 949, 957-958.)

Determination of that intent "is a question of ordinary contract interpretation," (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524), the primary goal of which "is to give effect to the parties' intent as it existed at the time of contracting" (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1023 (*Spinks*)). "Intent is to be inferred, if possible, solely from the language of the written contract." (*Ibid.*) Nonetheless, other factors may

10

be relevant to whether a contract was intended to benefit a third party. (*Ibid*.) "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 437.) Although the determination regarding the existence of a third party beneficiary ordinarily presents a question of fact, the issue can be resolved when the contract and the circumstances surrounding its negotiation are not in dispute. (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1233.)

As discussed below (see pt. A.3. of the Discussion, *post*), the question of contractual interpretation presented here hinges in part on the ownership interests relating to a trust. "Under general principles of trust law, trust beneficiaries hold 'an equitable estate or beneficial interest in' property held in trust and are '"regarded as the real owner[s] of [that] property."' [Citation.] The trustee is '"merely the depositary of the legal title"' to the property (*ibid.*); '"the legal estate"' the trustee holds '"is . . . no more than the shadow . . . following the equitable estate . . . ."' [Citation.]" (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319, quoting *Title Ins. & Trust Co. v. Duffill* (1923) 191 Cal. 629, 647-648.)

The issues presented here also involve principles governing the assignment of claims. "An assignment carries with it all the rights of the assignor. [Citations.] 'The assignment merely transfers the interest of the assignor. The assignee 'stands in the shoes' of the assignor, taking his rights and remedies, subject to any defenses which the obligor has against the assignor prior to notice of the assignment.' [Citation.] Once a claim has been assigned, the assignee is the owner and has the right to sue on it. [Citations.]" (*Johnson v. County of Fresno*

11

(2003) 111 Cal.App.4th 1087, 1096 (*Johnson*), italics omitted; 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 735, pp. 819-820.)

Generally, Civil Code section 954 "permits an owner of a chose in action to assign it to another person where it arises 'out of the violation of a right of property, or out of an obligation.' Such types of choses in action include, for example, breach of contract or damage to personal or real property. [Citations.] Exceptions to the general rule of assignability . . . are choses in action for wrongs done to the person, the reputation or the feelings of the injured party, and to contracts of a purely personal nature, like promises of marriage. [Citation.]" (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1032.)

## 2. *Underlying Proceedings*

Laura and Tom's complaint asserts two claims against L.A. Stucco, namely, a negligence claim and a breach of contract claim predicated on the allegation that L.A. Stucco's contract with Building Dreams was "for the benefit of" Laura and Tom. Later, Shelley Mulitz, as trustee of the S.A.G.M. Trust, assigned to them "all of the claims and rights" owned by the trust "against any party with respect to the construction, remodeling, and any other work performed at [the house]."

Prior to trial, United filed a motion in limine seeking to exclude all evidence relating to any breach of contract claim "based on a third party beneficiary theory," arguing that Laura and Tom were merely incidental beneficiaries of the contract between L.A. Stucco and Building Dreams. In support of that contention, United pointed to deposition testimony from Ruben Sabata and Daniel Batres of Building Dreams. Both stated that they did not understand the contract to be for the benefit of Laura and Tom, and Sabata also asserted that he never discussed that issue with them. United also observed that when deposed, Tom denied that he

intended to be "part" of the contract, and Laura stated that she was unaware of that contract.

During the hearing on the motions in limine, the trial court questioned whether Laura and Tom had standing to assert their claims, as the parties' joint factual statement indicated that they did not own the house. After Laura and Tom's counsel described the assignment of the trustee's claims, the court remarked, "So . . . I'm going to assume then that we don't have a standing issue and we need not amend?" When Laura and Tom's counsel affirmed his willingness to amend the complaint to reflect the assignment, United's counsel directed the court's attention to the pending motion in limine regarding Laura and Tom's status as third party beneficiaries of L.A. Stucco's contract with Building Dreams. The court denied the motion in limine, and asked the parties to discuss whether any amendment to the complaint was required to reflect the assignment. When United's counsel sought a continuance in order to submit briefing regarding whether the complaint required an amendment, the court denied that request, stating that United had long known that the trust owned the house.

Although United never subsequently challenged the adequacy of the complaint's allegations, the parties attempted to elicit testimony from Daniel Batres bearing on Laura and Tom's status as third party beneficiaries. On direct examination, Batres testified that Building Dreams and L.A. Stucco executed a written contract "designed to benefit Laura." When cross-examined, Batres acknowledged that during his deposition, he denied that he had any understanding that the contract was for the benefit of Laura and Tom.

Following the close of presentation of evidence, the trial court concluded that Laura and Tom were third party beneficiaries, relying primarily on *Gilbert Financial Corp. v. Steelform Contracting Co.* (1978) 82 Cal.App.3d 65 (*Gilbert*

13

*Financial*).  Later, United sought a directed verdict on Tom's claims, arguing that there was no evidence he paid for the repairs to L.A. Stucco's work or Laura's rent and moving expenses during those repairs.  After hearing argument regarding the scope and effects of the trustee's assignment, the court denied the motion.  The parties then stipulated that "the assignment from the trust . . . is valid as to all claims in issue, tort or contract."

Following the jury's verdict, United sought a new trial, arguing that Laura and Tom were not third party beneficiaries of L.A. Stucco's contract with Building Dreams, and that the trust had no viable breach of contract claim to assign to them.  In addition, United opposed Laura and Tom's fee requests on the ground that they were not third party beneficiaries with respect to the fee provision in the contract.  The trial court denied the new trial motion and issued fee awards to Laura and Tom.

### 3. *The Mulitzes' Breach of Contract Claim*

We begin with United's contention that the breach of contract claim was fatally defective because neither Laura nor Tom is a third party beneficiary of L.A. Stucco's contract with Building Dreams.  As explained below, that contention fails for two reasons:  first, Laura is a third party beneficiary of that contract; second, as assignees of the trust's claims, both Laura and Tom were entitled to assert a breach of contract claim because they stood in the shoes of the trustee, who also was a third party beneficiary of the contract.

Here, ascertaining the existence of third party beneficiaries under the contract is properly resolved as a question of law by reference to the contract's terms themselves, as there is no relevant extrinsic evidence bearing on the expressed intentions of the parties to the contract.  (*Parsons v. Bristol*

14

*Development Co*. (1965) 62 Cal.2d 861, 865.) Generally, the circumstances surrounding the negotiation of a contract may be relevant to its interpretation (1 Witkin, Summary of Cal. Law, *supra,* § 748, pp. 836-838), but not the private and unexpressed views of participants in the negotiations (*Edwards v. Comstock Insurance Co.* (1988) 205 Cal.App.3d 1164, 1169). Although the record discloses potential evidence regarding several persons' subjective understanding of the contract, none suggested that he or she *expressed* that understanding to anyone else when the contract was executed. That evidence is thus immaterial to the question before us.[4]

Our focus is therefore on the terms of the contract. To be an express third party beneficiary, a person "'need not be named or identified individually,'" as it is sufficient that the contract shows he or she "'is a member of a class of persons for whose benefit it was made.'" (*Spinks*, *supra*, 171 Cal.App.4th at p. 1023.) Here, the contract designates Building Dreams as the "GC" and L.A. Stucco as the "[s]ub-[c]ontractor," and sets forth their duties regarding the "[p]roject," which is identified by the address of the house. The contract also imposes duties on L.A. Stucco directed toward "the owner," stating: "The [s]ub-contractor warrants to the owner that materials and equipment furnished . . . will be of good quality and new unless otherwise required or permitted by the GC; that the work will be free from defects not inherent in the quality required or permitted[;] and that the work will conform to the requirements of the GC." Those terms establish that the "owner" is a third party beneficiary. (*Gilbert Financial, supra,* 82 Cal.App.3d at pp. 65, 69-

---

[4]    For that reason, we reject United's contention that the trial court was obliged to submit the third party beneficiary issue to the jury.

71 [owner of building to be erected pursuant to a construction contract was third party beneficiary of agreement between general contractor and subcontractor].)

Under the circumstances of this case, Shelley Mulitz, as trustee of the trust, and Laura, as the trust's beneficiary, are members of the class of persons -- namely the "owner" -- identified as the contract's third party beneficiary, as the contract identifies the project with the house. As explained above (see pt. A.1. of the Discussion, *ante*), under the trust, Laura is the house's "'real owner,'" although Shelley Mulitz holds its legal title and -- absent an assignment -- has exclusive authority to litigate claims regarding it against strangers. Accordingly, Shelley Mulitz and Laura were the contract's third party beneficiaries.

In view of the assignment of the trust's claims to Laura and Tom, each acquired standing to assert a breach of contract claim, as they stood in the shoes of Shelley Mulitz. Although the complaint was not amended to reflect the assignment as the basis for Laura and Tom's standing, United never asked the them to do so, despite repeated offers from their counsel, and instead entered into a stipulation regarding the assignment's validity. Any technical defect in the complaint was therefore forfeited, as "the matter of pleading becomes unimportant when a case is fairly tried upon . . . under circumstances which indicate that nothing in the pleadings misled the unsuccessful litigant to his injury." (*Buxbom v. Smith* (1944) 23 Cal.2d 535, 543.) United's challenge to the breach of contract claim thus fails, insofar as it attacks Laura and Tom's entitlement to assert the rights of third party beneficiaries.

United's reliance on *The H.N. & Frances C. Berger Foundation v. Perez* (2013) 218 Cal.App.4th 37 is misplaced. There, the plaintiff brought an action against a county and other defendants to enforce the performance of agreements and related instruments concerning the construction of a road. (*Id.* at pp. 41-42.)

16

The trial court sustained a demurrer to the complaint without leave to amend, concluding that the plaintiff was neither a party to the agreements and related instruments, nor a third party beneficiary of them. (*Id*. at pp. 42-43.) On appeal, the plaintiff contended that it was a member of a class for whose benefit the agreements and other instruments were made, namely, the owners of property adjoining the proposed road. (*Id*. at p. 44.) Rejecting that contention, the appellate court emphasized that the agreements and other instruments contained no provision referring to that class. (*Id*. at p. 45.) In contrast, the contract here expressly set forth L.A. Stucco's duties to the "owner." In sum, Laura and Tom were entitled to assert the breach of contract claim.

### 4. *Trust's Breach of Contract Claim*

United contends the trust had no viable breach of contract claim to assign to Laura and Tom, arguing that the trust suffered no damages because Laura -- not the trust -- paid for the remediation of L.A. Stucco's work, as well as for her rent and moving expenses during the remediation. We disagree. Although the owner of property is ordinarily the person entitled to assert claims for damages relating to the property, in some instances the right to recover those damages may be vested in a person other than the property owner. (See *Vaughn v. Dame Construction Co.* (1990) 223 Cal.App.3d 144, 146-149 [in construction defects action, plaintiff who asserted claims for breach of warranty, strict liability, and negligence retained right to recover damages, even though she sold the property after initiating lawsuit].) That is the case here. As explained above (see pt. A.3, of the Discussion, *ante*), Laura was effectively the house's real owner, and thus her remediation-related payments reflected *her* interest in the house. However, because the trustee had sole authority to assert claims relating to the house against

17

strangers, damages to Laura's interest in the house could be recovered only by the trustee, absent an assignment.  Accordingly, the trust had a viable breach of contract claim to assign to Laura and Tom.


5.  *Right to Contractual Attorney Fees*

United maintains that Laura and Tom were not entitled to enforce the contract's attorney fee provision under a third party beneficiary theory.  As explained below, we reject that contention.

Nonsignatories to a contract may be third party beneficiaries of certain contract provisions, but not the contract as a whole.  (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 709 (*Whiteside*).)  Thus, third party beneficiary plaintiffs seeking a contract-based fee award against a signatory defendant must establish that they have the right to enforce the contract's fee provision.  (*Loduca v. Polyzos* (2007) 153 Cal.App.4th 334, 341 (*Loduca*).)  That showing is ordinarily subject to the principles of contract interpretation.  (*Ibid*.)

We find guidance regarding United's contention from *Loduca* and *Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal.App.4th 375, 380-383 (*Real Property Services*).  In *Loduca*, the owner of a house sued a general contractor and subcontractor as a third party beneficiary of their contract, and prevailed on his breach of contract claim.  (*Loduca*, *supra*, 153 Cal.App.4th at pp. 337-338.)  The trial court issued a fee award to the plaintiff under the contract's fee provision, which stated:  "'If a court action is brought, prevailing party to be awarded attorneys fees . . . .'"  (*Id*. at p. 337.)  Affirming the award, the appellate court concluded that the plaintiff was entitled to enforce the broad fee provision, as it did not restrict awards to specific individuals, and the contract

otherwise clearly identified the plaintiff as a third party beneficiary. (*Id*. at pp. 343-344.)

In *Real Property Services*, after a sublessee of commercial property unsuccessfully sued the lessor for breach of the lease, the trial court denied the lessor's request for a fee award under the lease's fee provision, which stated: "'[I]n the event of any action or proceeding brought by either party against the other under this Lease, the prevailing party shall be entitled to recover for the fees of its attorneys in such action or proceeding . . . in such amount as the court may adjudge reasonable.'" (*Real Property Services*, *supra*, 25 Cal.App.4th at pp. 377-378.) As the action was subject to Civil Code section 1717, which mandates reciprocity with respect to fee awards in "any action on a contract" (Civ. Code, § 1717, subd. (a)), the appellate court focused its analysis of the ruling on whether the sublessee, as a nonsignatory to the lease, would have been entitled to a fee award had it prevailed against the lessor. (*Real Property Services*, *supra*, at pp. 382-383.) The court determined that the sublessee possessed that right, as the lease expressly noted the sublessee's occupation of the property, and it was otherwise well established that any sublessee so recognized may sue the lessor for breach of the lease as a third party beneficiary of the lease. (*Ibid*.) Because there was "a sufficient nexus" between the lessor and sublessee to support a fee award in favor of the sublessee had it prevailed, the court reversed the denial of the lessor's request. (*Id*. at pp. 383-384.)

In view of the assignment of the trustee's rights, we conclude that Laura and Tom were entitled to enforce the contract's fee provision under a third party beneficiary theory. That provision states: "In the event of *any* arbitration or *litigation relating to the project*, *project performance* or this contract, the prevailing party shall be entitled to reasonable attorney fees . . . ." (Italics added.)

19

As explained above (see pt. A.3. of the Discussion, *ante*), the contract otherwise clearly designated the "owner" -- that is, the trustee and Laura -- as a third party beneficiary with respect to L.A. Stucco's performance under the contract. The trustee's and Laura's status as third party beneficiaries, coupled with the broad language of the fee provision, thus established their right to seek a fee award. Furthermore, as the trustee assigned to Laura and Tom "all of the claims and rights" owned by the trust "against any party with respect to the construction, remodeling, and any other work performed at [the house]," the trust's right to a fee award was transferred to them. (*Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1290-1291.)

The decisions upon which United relies are distinguishable. In *Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 675-677, a general contractor entered into a written contract with a subcontractor, which in turn employed a payroll services provider. Later, the payroll services provider sued the general contractor for breach of its contract with the subcontractor, alleging that it was a third party beneficiary of that contract. (*Ibid.*) The trial court sustained a demurrer without leave to amend to the complaint because the contract contained express exclusions regarding the existence of third party beneficiaries, but nonetheless awarded attorney fees to the general contractor pursuant the contract's fee provision, which stated: "'In the event it becomes necessary for either party to enforce the provisions of this Agreement or to obtain redress for the violation of any provision hereof, . . . , the prevailing party shall be entitled to recover from the other party . . . reasonable attorney fees.'" (*Id.* at p. 676.) Relying on the reciprocity requirement in Civil Code section 1717, the appellate court reversed the award, concluding that the payroll services provider would not have been entitled to an award had it prevailed, in view of the contract's

express exclusions regarding third party beneficiaries and the narrowly tailored fee provision. (*Sessions Payroll Management, Inc., supra,* 84 Cal.App.4th at pp. 680-681.) In contrast, the contract here establishes the trustee's and Laura's status as third party beneficiaries, and contains a broad fee provision.

In *Whiteside*, the plaintiff's medical insurer executed a contract with a hospital that regulated the hospital's authority to bill the insurer's customers for medical services. (*Whiteside*, *supra*, 101 Cal.App.4th at pp. 698-700.) Although the contract required the insurer and hospital to attempt to resolve disputes by arbitration before engaging in litigation, it stated: "'Nothing contained in this Agreement requires [the] Hospital to arbitrate or otherwise handle in any particular manner or dispose of any claim or action (malpractice or otherwise) by a patient against Hospital arising out of services performed by Hospital.'" (*Id*. at pp. 707-709.) After the patient unsuccessfully asserted claims against the hospital as an alleged third party beneficiary of his insurer's contract with the hospital, the trial court awarded attorney fees to the hospital under the contract's fee provision, which stated: "'If proceedings are necessary to enforce this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief it may obtain.'" Pointing to the reciprocity requirement in Civil Code section 1717, the appellate court reversed the award, finding no "nexus" between the patient and hospital sufficient to support a fee award in the patient's favor as a third party beneficiary of the provision. (*Whiteside, supra,* at pp. 706-710.) In so concluding, the court determined that the fee provision fell within the contract terms specifying the procedure for resolving disputes between the insurer and hospital, from which the patient was expressly exempt. (*Ibid*.) Here, the contract does not exempt the "owner" from the benefits of the fee provision.

21

In *Super 7 Motel Associates v. Wang* (1993) 16 Cal.App.4th 541, 544-545, a buyer of real property initiated a fraud action against the seller and broker involved in the sale. After the broker prevailed on the claims against him, he obtained a contractual fee award against the buyer under a fee provision found in the sales agreement between the buyer and seller. (*Id*. at pp. 547-548.) The appellate court reversed the award, concluding that nothing in the sales agreement rendered him a third party beneficiary of *any* of its provisions. (*Ibid.*) As explained above, that is not the case here. In sum, Laura and Tom were entitled to enforce the fee provision of Building Dreams's contract with L.A. Stucco.

B. *Economic Loss Rule*

United asserts two contentions regarding the potential application of the economic loss rule to Laura and Tom's negligence claim, arguing that the rule barred their recovery of tort damages, and that the jury instructions failed to reflect the rule. For the reasons discussed below, those contentions fail.

1. *Governing Principles*

As our Supreme Court has explained, "the economic loss rule provides: ""[W]here a purchaser's expectations in a sale are frustrated because the product he bought is not working properly, his remedy is said to be in contract alone, for he has suffered only "economic" losses."" . . . The economic loss rule requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise. [Citation.] Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.' [Citation.]" (*Robinson Helicopter Co. v. Dana Corp.* (2004) 34 Cal.4th 979, 988.)

22

The application of the economic loss rule in construction defect actions is examined in *Aas v. Superior Court* (2000) 24 Cal.4th 627 (*Aas*) and *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477-481 (*Jimenez*).  In *Aas*, a group of homeowners asserted causes of action for negligence and related claims against the builders of their homes, alleging that the homes suffered from multiple construction defects.  (*Aas*, *supra*, 24 Cal.4th at pp. 632-635.)  After the trial court granted the builders' motions in limine to exclude evidence of any defect that had not resulted in bodily injury or physical damage, the homeowners sought relief through writ proceedings.  (*Id*. at pp. 632-633.)  In affirming the trial court's ruling, our Supreme Court explained that "appreciable, nonspeculative, present injury is an essential element of a tort cause of action."  (*Id*. at p. 646.)  The court concluded:  "Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of '"appreciable harm "'" -- an essential element of a negligence claim."  (*Ibid*.)

In *Jimenez*, two window manufacturers supplied windows for mass-produced homes in housing developments.  (*Jimenez*, *supra*, 29 Cal.4th at pp. 476-477, 479.)  The trial court granted their motion for summary adjudication on strict liability claims based on defects in the windows.  (*Ibid*.)  In concluding that the grant of summary judgment was erroneous, our Supreme Court held that manufacturers of component parts installed in mass-produced homes may be subject to strict products liability in tort when their defective products cause harm.  (*Id*. at  pp. 479-481.)  The court further examined the extent to which the economic loss rule may circumscribe that liability, explaining that the rule allows a plaintiff to recover in tort "when a product defect causes damage to 'other property,' that is property other than the product itself."  (*Id*. at p. 483, italics omitted.)  The court stated:  "To apply the economic loss rule, we must first

23

determine what the product at issue is.  Only then do we find out whether the injury is to the product itself (for which recovery is barred by the economic loss rule) or to property other than the defective product (for which plaintiffs may recover in tort)."  (*Ibid*.)

### 2.  *Underlying Proceedings*

Prior to trial, United filed a motion in limine seeking to exclude all evidence of alleged construction defects that had not caused "any present, appreciable damage to 'other property.'"  In opposing the motion, Laura and Tom asserted their intent to present evidence that L.A. Stucco used the "wrong kind of nails" that "actually penetrated the waterproofing all around the house," and thereby "caused extensive damage."  The court denied the motion in limine, stating that Laura and Tom would be limited to damages for breach of contract if they demonstrated only "defects without damage."

At trial, Laura and Tom's stucco experts, Roberts and McCormick, testified that the house suffered some water intrusion that L.A. Stucco's work should have -- but did not -- eliminate.  They further testified that L.A. Stucco had created a *new* source of water intrusion.  According to Roberts and McCormick, L.A. Stucco had improperly used concrete nails that penetrated the house's building paper and flashings, which they described as the house's "weather-resistant barrier" or "waterproof membrane."  Roberts stated that when he conducted a "water" or "trickle" test at a sliding door, water pooled inside the house.  Roberts and McCormick opined that the holes created by the concrete nails precluded the use of the "omega system" to remediate L.A. Stucco's defective work, and required the removal and replacement of the entire stucco system.

In contrast, United's stucco expert Harrington testified that L.A. Stucco had appropriately used concrete nails around the windows and doors, and that the defects in L.A. Stucco's work were remediable through an application of the omega system. He maintained there was no credible evidence that any water intrusion was attributable to L.A. Stucco's work.

Following the close of presentation of evidence, at the trial court's invitation, the parties submitted additional briefing on the economic loss rule. After concluding that the case was not subject to the rule, the trial court gave no instruction regarding it.

In closing argument, Laura and Tom's counsel maintained that because L.A. Stucco's use of concrete nails necessitated the remediation work actually undertaken, Laura and Tom were entitled to recover the $364,359 she paid for that work, together with approximately $131,000 in rent and moving expenses. United's counsel contended there was no evidence that the nails had caused any actual water intrusion. He thus asserted that Laura and Tom were entitled to recover only the costs of installing an omega system -- which he estimated at $116,547 -- plus approximately $19,500 in additional costs.

The jury was presented with a special verdict form that required no findings reflecting the economic loss rule, and no allocation of damages to the breach of contract and negligence claims. The jury found that L.A. Stucco was negligent, that it had breached its written contract with Building Dreams, and that Laura and Tom had suffered $403,827 in damages.

### 3. *Entitlement to Tort Damages*

United contends the economic loss rule barred Laura and Tom from recovering the $364,359 Laura paid to remediate L.A. Stucco's work, arguing that

there was no evidence of actual damage to other property beyond that work. According to United, Laura and Tom demonstrated only defects *within* the work, namely, delamination and cracking. Although the concrete nails pierced the house's pre-existing building paper and flashings, United maintains that the penetrations do not constitute actual damage because Laura and Tom showed no actual water infiltration attributable to them. The crux of United's contention is that creating numerous holes in the house's water barrier did not constitute actual damage until water intrusion occurred. We disagree.[5]

United's contention raises an issue regarding the application of the economic loss rule, namely, whether an item of property with a designated function -- here, the house's pre-existing water barrier -- suffered actual damage when its capacity to discharge that function was materially impaired, even though that failure had not yet manifested itself. In *Duarte v. Zachariah* (1994) 22 Cal.App.4th 1652, 1660-1665 (*Duarte*), the appellate court addressed a closely related issue regarding the existence of bodily injury. There, following a mastectomy to remove a breast cancer, the plaintiff consulted with a doctor regarding measures intended to reduce the chances of the cancer's recurrence. (*Id.*

---

[5]    We note that the trial court concluded the economic loss rule was inapplicable to the underlying action -- which it characterized as "a negligently performed services case" -- because it regarded the rule as encompassing only products liability actions. Although at least one appellate court has held that the rule does not encompass certain negligence claims relating to defective services (*North American Chemical Co. v. Superior Court* (1997) 59 Cal.App.4th 764, 777-779), our Supreme Court has criticized the rationale offered for that limitation without resolving the extent to which the rule may be subject to it. (*Aas*, *supra*, 24 Cal.4th at pp. 643-653 & fn. 11.) Because United's contentions fail for other reasons (see pts. B.3 & B.4 of the Discussion, *post*), it is unnecessary to examine the trial court's determination.

at pp. 1655-1656.) The doctor negligently administered excessive doses of a drug, which impaired the ability of the patient's bone marrow to produce blood platelets. (*Id*. at pp. 1656-1657.) That impairment precluded any future use of chemotherapy to treat cancer, as it rendered the plaintiff susceptible to hemorrhaging while on chemotherapy. (*Id*. at pp. 1656, 1663.) Following a recurrence of the plaintiff's breast cancer, she initiated a malpractice action against the doctor. (*Id*. at p. 1655.) The trial court granted nonsuit on her negligence claim, concluding there was no evidence that the medication overdose caused the recurrence of her cancer. (*Ibid.*)

Although the appellate court agreed with that aspect of the ruling, it determined that the injury to the plaintiff's bone marrow was actionable regardless of whether it caused her cancer. (*Duarte, supra,* 22 Cal.App.4th at p. 1655.) The court determined that the reduction in the bone marrow's capacity to produce platelets constituted "'actual damage,'" for purposes of recovery in negligence. (*Id*. at pp. 1661-1663.) The court stated: "Such an impairment is a detrimental change in the physical condition of [the plaintiff's] body. The evidence shows that platelets are the component of blood that causes the blood to clot in response to a wound or cut. There is no testimony in the record whether the degree of that impairment affected blood clotting in ordinary circumstances, e.g., cuts or hemorrhage caused by trauma.[] However, there is testimony that the change in [the plaintiff's] bone marrow rendered her peculiarly susceptible to suppression of the production of blood platelets if treated by chemotherapy, subjecting her to life-threatening spontaneous hemorrhaging. This susceptibility prevented the renewal of chemotherapy . . . before the detection of the recurrence of her cancer,[] and precludes the present treatment of the cancer by this means. [¶] This evidence

27

shows that the change in [the plaintiff's] bone marrow was an appreciable *functional* impairment . . . . " (*Id*. at p. 1663, fns. omitted.)

Under the rationale in *Duarte*, the physical impairment of an item's *capacity* to function may constitute actual damage even though no failure has yet occurred, provided that the impairment is sufficiently material or significant. Here, Laura and Tom's experts testified that the concrete nails had injured the integrity of the house's "weather-resistant barrier" or "waterproof membrane," and that testing at a sliding door showed that water would, in fact, infiltrate through a nail hole. In our view, that evidence established "an appreciable functional impairment" of the house's pre-existing water barrier (*Duarte, supra,* 22 Cal.App.4th at p. 1663, italics omitted), thus showing damage to "property other than [L. A. Stucco's] defective product," for purposes of the economic loss rule (*Jimenez*, *supra*, 29 Cal.4th at p. 479).[6]

### 4. *Instruction On Economic Loss Rule*

United contends the trial court erred in failing to instruct the jury regarding the economic loss rule. As explained below, United has shown no error in the instructions.

---

[6] United's reliance on *Fieldstone Co. v. Briggs Plumbing Products, Inc.* (1997) 54 Cal.App.4th 357 and *Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, disapproved on another ground in *Jimenez, supra*, 29 Cal.4th at p. 481, fn. 1, is thus misplaced. In each case, the economic loss rule barred the recovery of tort damages because there was no evidence of injury to property other than the defendant's own defective product. (*Fieldstone Co., supra*, 54 Cal.App.4th at pp. 363-366; *Casey, supra*, 74 Cal.App.4th at pp. 123-124.) That is not the case here.

Generally, "[a] party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572, (*Soule*).) However, "[i]n a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation." (*Downing v. Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 523.) "The trial court has no duty to instruct on its own motion, nor is it obligated to modify proposed instructions to make them complete or correct. [Citations.] Such instructions may be rejected without the trial court's attempting to modify or correct them. [Citation.]" (*Maureen K. v. Tuschka* (2013) 215 Cal.App.4th 519, 526.) Thus, "[i]n order to complain of failure to instruct on a particular issue the aggrieved party must request the specific proper instructions. [Citations.]" (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335.)

The application of the forfeiture principle hinges on the adequacy of the instructions as given. "When a trial court gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given. [Citation.] However, when a trial court gives a jury instruction which is prejudicially *erroneous as given,* i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal. [Citation.]" (*Suman v. BMW of North America* (1994) 23 Cal.App.4th 1, 9.)

Here, United forfeited its contention of instructional error. During the discussions on jury instructions, United directed the trial court's attention to *Aas*

29

and requested that the jury be instructed in accordance with that decision, but proposed no specific instruction. As explained above, the trial court was not required to create an instruction for United.

In an apparent effort to avoid a forfeiture, United suggests that the jury instructions as given were defective, arguing that they incorrectly stated that Laura and Tom were entitled to the same damages under the claims for breach of contract and negligence. We disagree.

In construction defect actions, plaintiffs may recover "the cost of repairing the home, including lost use or relocation expenses . . . ." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 561; see *Orndorff v. Christiana Community Builders* (1990) 217 Cal.App.3d 683, 687-691.) Those damages are available for negligence, as well as for breach of contract, subject to the special restrictions imposed on contractual damages. (See *Erhlich, supra*, 21 Cal.4th at p. 561; *Walker v. Signal Companies, Inc.* (1978) 84 Cal.App.3d 982, 993; *Amerson v. Christman* (1968) 261 Cal.App.2d 811, 824-825.) As our Supreme Court has explained, "'[c]ontract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable. [Citations.] . . . .' [Citation.] 'In contrast, tort damages are awarded to [fully] compensate the victim for [all] injury suffered. [Citation.]' [Citation.]" (*Id.* at p. 550, quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 515-516.)

The instructions given to the jury accurately reflected these principles. They informed the jury that upon proper proof, the Mulitzes were entitled to the costs of repairing the house and Laura's relocation expenses, but expressly stated that contract damages were subject to the requirements stated above. In addition,

30

the instructions asserted that "each item of damages may be awarded only once regardless of the number of legal theories alleged." We discern no error in the instructions given.

Furthermore, we would find no prejudice were there no forfeiture. The improper rejection of a requested instruction is not reversible error unless the omission was prejudicial, that is, it is "reasonably probable defendant would have obtained a more favorable result" had the instruction been given. (*Soule*, *supra*, 8 Cal.4th at p. 570.) "A 'reasonable probability' in this context 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.'" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682, italics omitted, quoting *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) To determine whether instructional error was prejudicial, we evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, at pp. 580-581.) In this regard, the evidence is viewed in the light most favorable to the party claiming error. (*Sesler v. Ghumman* (1990) 219 Cal.App.3d 218, 223.)

Here, there is no reasonable probability of an outcome more favorable to United had the jury been instructed regarding the economic loss rule. As explained above (see pt. B.1. of the Discussion, *ante*), the rule operates to bar the recovery of tort damages only upon a threshold determination that there is no damage to property other than "the defective product." (*Jimenez*, *supra*, 29 Cal.4th at p. 483.) Thus, any instruction regarding the rule would have informed the jury that Laura and Tom would not be entitled to damages for negligence if it found no damage to property other than L.A. Stucco's defective stucco work. However, the record shows that the jury necessarily found damages to property

31

that pre-existed L.A. Stucco's work. In concluding that Laura and Tom were entitled to full compensation for the remediation they undertook, the jury rejected United's theory that L.A. Stucco's work created no damage to the house's water-barrier. For that reason, the jury would have rejected the application of the economic loss rule had it been instructed regarding that rule. In sum, United has shown no instructional error.[7]

C. *Expert Testimony*

United contends the trial court improperly barred its expert Harrington from testifying regarding the bases of his opinion. As explained below, United has forfeited its contention for want of a timely offer of proof, and in any event, the late-proffered testimony would have constituted inadmissible hearsay.

Generally, hearsay may underpin expert testimony, subject to certain limitations. Expert opinions may be based on "hearsay information of a type reasonably relied upon by professionals in the field in forming an opinion on the subject may be used to support an expert opinion, even though not admissible in court." (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524, italics

---

[7] For similar reasons, we reject United's related contention, namely, that the special verdict form was defective because it requested the jury find the total amount of damages without allocating them to a specific theory. Although a special verdict form must allow the jury to resolve every material issue, any failure to do so is subject to harmless error analysis. (*Taylor v. Nabors Drilling U.S.A., LP* (2014) 222 Cal.App.4th 1228, 1240, 1244-1247.) Here, the record establishes that the jury accepted Laura and Tom's theory of negligence in its entirety, as the instructions regarding that theory were accurate, the jury found that L.A. Stucco had engaged in negligence, and the jury awarded Laura and Tom *all* the damages they sought. The record thus discloses no reversible error in the special verdict form.

32

omitted.)  In contrast, expert opinion founded on unreliable hearsay is not admissible.  (*Ibid*.)  Furthermore, "[w]hile an expert may state on direct examination the matters on which he relied in forming his opinion, he may not testify as to the details of such matters if they are otherwise inadmissible." (*Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 788-789.)  The trial court is authorized to exclude expert opinion founded on unreliable hearsay (*Korsak*, *supra,* 2 Cal.App.4th at p. 1524), and regulate the recitation of the details of reliable hearsay underlying an expert's opinion (*Grimshaw*, *supra,* 119 Cal.App.3d at pp. 788-789).

Ordinarily, in order to preserve an objection to the exclusion of testimony during a witness's direct examination, the evidence's proponent must make an offer of proof or its equivalent.  (Evid. Code, § 354, subd. (a).)  "[An] offer of proof must be specific in its indication of the purpose of the testimony, the name of the witness, and the content of the answer to be elicited."  (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 414, p. 569; accord, *Semsch v. Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162, 167.)  In addition, the offer of proof must be timely.  (*Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1086 (*Malatka*).)  The requirement for an offer of proof is applicable to the exclusion of expert testimony.  (*McCleery v. City of Bakersfield* (1985) 170 Cal.App.3d 1059, 1073-1074.)

On direct examination, Harrington testified that Building Dreams's expert, Gidon Vardi, had visited the house.  Laura and Tom's counsel then asserted objections to the line of questioning, which the trial court sustained.  When United's counsel inquired whether Harrington discussed with Vardi whether complete removal and replacement of the house's stucco system was appropriate,

33

Laura and Tom's counsel asserted an objection predicated on relevance and the hearsay rule. The following colloquy then occurred:

"The court: Sustained. Let's not pursue this any further.

"[United's counsel]: An expert is allowed to rely --

"The court: Excuse me. No. they're not."

Without offering a description of Harrington's proposed testimony, United's counsel examined Harrington regarding other topics.

United's motion for a new trial challenged the exclusion of the proposed testimony. Accompanying the motion was a declaration from Harrington, which United offered as a description of Harrington's proposed testimony. Harrington stated that he had conferred several times with Vardi to "prepar[e] a joint defense methodology." He further stated: "[Vardi] and I agreed that L.A. Stucco's work was deficient but that the scope of repairs being performed by [Laura and Tom] was excessive . . . . Specifically, we agreed that there were many existing problems with [the house] that was built in the 1970's, including, but not limited to, water intrusion at decks and columns, that were included in [Laura and Tom's] repairs but completely unrelated to L.A. Stucco's work." According to Harrington, he and Vardi had "jointly formulat[ed]" an alternative repair proposal.

We conclude that United failed to preserve its contention regarding Harrington's testimony, as it first made an offer of proof in a post-trial motion, almost two months after the jury returned its verdict. (*Malatka, supra*, 188 Cal.App.4th at p. 1087 [party forfeited contention regarding exclusion of evidence because it made no offer of proof until post-ruling motion two months after evidentiary hearing].) Furthermore, we would find no error were there no forfeiture, as Harrington's declaration established that his proposed testimony constituted inadmissible hearsay. In *Mosesian v. Pennwalt Corp.* (1987) 191

34

Cal.App.3d 851, 857, disapproved on another ground in *People v.* Ault (2004) 33 Cal.4th 1250, 1272, fn.15, an expert was permitted to testify that his opinion regarding the toxicity of a pesticide was based in part on his consultation with six other experts, all of whom shared his opinion. The appellate court concluded that that portion of the expert's testimony was inadmissible, stating: "The general and well-settled rule prevents an expert from predicating an opinion upon the outside opinion of another expert. [Citation.] The expert should base the opinion upon facts personally observed or upon a hypothesis supported by the evidence. [Citation.] [¶] The opinions of the six outside experts were unquestionably hearsay opinions. Experts may rely upon hearsay in forming opinions. They may not relate an out-of-court opinion by another expert as independent proof of fact. [Citation.] It is proper to solicit the fact that another expert was consulted to show the foundation of the testifying expert's opinion, but not to reveal the content of the hearsay opinion. [Citation.]" (*Id.* at p. 860.) Harrington's proposed testimony was thus properly excluded. In sum, United has established no error relating to the limitation of Harrington's testimony.

### D. *United's Fee Request*

United contends the trial court erroneously denied its request for an award of attorney fees as the prevailing party on Building Dreams's first amended complaint (FACC), which was dismissed after the close of presentation of evidence at trial. For the reasons discussed below, we reject the contention.

### 1. *Governing Principles*

Attorney fees are not recoverable as costs unless expressly authorized by statute or contract. (Code Civ. Proc., §§ 1021, 1033.5.) Here, United sought a fee

35

award as an item of costs pursuant to the attorney fee provision of L.A. Stucco's agreement with Building Dreams, which states: "In the event of any . . . litigation relating to the project, project performance or this contract, the prevailing party shall be entitled to reasonable attorney fees . . . ." That provision, viewed in isolation, is sufficiently broad to support the prevailing party's recovery of fees as costs with respect to contract and non-contract claims. (*Silver v. Boatwright Home Inspection, Inc.* (2002) 97 Cal.App.4th 443, 449 (*Silver*).)

"Whether a party to litigation is entitled to recover costs is governed by Code of Civil Procedure section 1032, which provides, in subdivision (b), that '[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding.' For the purpose of determining entitlement to recover costs, 'Code of Civil Procedure section 1032 defines "prevailing party" . . . .'" (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 606 (*Santisas*).) In this regard, subdivision (a)(4) of section 1032 states: "'Prevailing party' includes . . . a defendant in whose favor a dismissal is entered . . . ." Generally, a party that falls squarely under this characterization is entitled to its costs as a matter of right. (*Crib Retaining Walls, Inc. v. NBS/Lowry, Inc.* (1996) 47 Cal.App.4th 886, 890.)

Nonetheless, the prevailing party under Code of Civil Procedure section 1032 may not qualify for a fee award under the tests for the designation of prevailing party applicable to Civil Code section 1717 (*Santisas*, *supra*, 17 Cal.4th at p. 619). That statute provides that "[i]n any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be

36

entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)

Subdivision (b)(1) of Civil Code section 1717 further provides: "(1) The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the action for the purposes of this section. [¶] (2) Where an action has been voluntarily dismissed or dismissed pursuant to a settlement of the case, there shall be no prevailing party for purposes of this section." The latter exception includes the voluntary dismissal of an action after the commencement of trial. (*D & J, Inc. v. Ferro Corp.* (1986) 176 Cal.App.3d 1191, 1193-1195 (*D & J*).)

United's fee request invoked the principles applicable to actions involving contract and non-contract claims. The FACC contained claims for declaratory relief, equitable contribution, and indemnity, together with a claim for breach of contract. Only the breach of contract and declaratory relief claims were potentially subject to Civil Code section 1717, as the remaining claims were not based on contract. (*Exxess Electronixx v. Heger Realty Corp.* (1998) 64 Cal.App.4th 698, 713-716.)

Under the circumstances of this case, the application of Civil Code section 1717 hinges on whether the dismissal of the FACC was voluntary. Code of Civil Procedure section 581 contains two pertinent provisions regarding dismissal after the commencement of trial. Subdivision (d) of Code of Civil Procedure section 581 (section 581(d)) states: "Except as otherwise provided in subdivision (e), the court shall dismiss the complaint, or any cause of action asserted in it, in its

entirety or as to any defendant, with prejudice, when upon the trial and before the final submission of the case, the plaintiff abandons it." Subdivision (e) of Code of Civil Procedure section 581 (section 581(e)) states: "After the actual commencement of trial, the court shall dismiss the complaint, or any causes of action asserted in it, in its entirety or as to any defendants, with prejudice, if the plaintiff requests a dismissal, unless all affected parties to the trial consent to dismissal without prejudice or by order of the court dismissing the same without prejudice on a showing of good cause."

As Witkin explains, dismissals under those provisions are voluntary, even though the propriety of a dismissal under section 581(d) is consigned to the court's discretion. (6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, §§ 311-312, pp. 766-768; *D & J*, *supra*, 176 Cal.App.3d at pp. 1193-1195.) Section 581(d) ordinarily requires "some affirmative action by the plaintiff in abandoning his cause of action." (6 Witkin, Cal. Procedure, *supra*, § 312, at p. 767.) Section 581(e) permits the plaintiff to request a dismissal. (6 Witkin, *supra,* § 311, at p. 766.) Under the provisions, a voluntary dismissal is "with prejudice" unless all the affected parties agree to a dismissal without prejudice, or the court finds "good cause" for such a dismissal. (*Id.*, § 313, at p. 768.)

In *Silver*, which involved a pretrial voluntary dismissal of a complaint containing contract and noncontract claims, the appellate court set forth the analysis appropriate for a contract-based fee request: "[W]hen a trial court is presented with a contractual claim for attorney's fees by a defendant who has been voluntarily dismissed from a suit . . . , the court must deny such fees as are limited to the parties' *contract* claims. Regarding the *noncontract* claims, the court must look to the parties' contractual attorney's fees provision to determine if it defines who is a prevailing party or addresses voluntary . . . dismissals. If the contract

does not provide such guidance, the court must utilize its discretion in determining whether such defendant should be considered a prevailing party for the purpose of recovering attorney's fees as costs under section[] 1032 . . . ." (*Silver*, *supra*, 97 Cal.App.4th at p. 452.)

### 2. *Underlying Proceedings*

After filing the FACC, Building Dreams entered into a settlement with Laura and Tom, which stated that it "will assign" to them all its claims against L.A. Stucco including those asserted in the FACC. Shortly before trial, the trial court found that the settlement had been made in good faith (Code Civ. Proc., § 877.6).

The FACC was never amended to reflect any assignment, and at trial Laura and Tom neither asserted the FACC's claims nor presented evidence expressly intended to support them. Following the close of presentation of evidence, but before the jury was instructed, United sought a directed verdict regarding the FACC's breach of contract claim, stating that it was "still outstanding," and had "never been addressed as part of this lawsuit against L. A. Stucco." After the court responded that the FACC was being dismissed pursuant to the settlement, the following colloquy occurred:

"[Laura and Tom's counsel]: "I agree with counsel. I did not present anything on behalf of Building Dreams [in] this case. [¶] My understanding, now that everything has been signed and a good faith settlement has been approved, all of it is being dismissed. [¶] . . . [¶] I can't imagine that it's not going to be dismissed as part of the settlement.

"The court: I don't know what you're talking about. You have that as part of this settlement. Tell them to file a dismissal --

"[Laura and Tom's counsel]: Well, it's also --

39

"The court: But they also failed to show up for trial, and if they don't show up for trial and present their case, then I'm going to dismiss the cross-complaint, so –

"[United's counsel]: That's *all* we're asking for, your honor.

"[The court]: All right. You've got it." (Italics added.)

After the jury returned its verdict, the trial court entered a judgment stating that the FACC had been dismissed "based on Building Dreams['s] failure to appear . . . ." United filed a motion for a fee award under Civil Code section 1717, arguing that the FACC's dismissal was not voluntary, and that "Building Dreams's decision not to appear at trial and prosecute its claims constitutes a complete abandonment of its claims." United sought a fee award totaling $302,769,46.

In opposing the fee request, the Mulitzes and Building Dreams asserted that the settlement had assigned the FACC's claims to the Mulitzes. Laura and Tom contended the FACC's dismissal was voluntary, arguing that the court had dismissed the FACC as an element of the settlement. Building Dreams maintained that United was not the prevailing party on L.A. Stucco's contract with Building Dreams, arguing that the jury's special verdicts established that L.A. Stucco had breached that contract.

United's replies to the oppositions contended that the FACC's dismissal was not voluntary because it followed the grant of United's motion for a directed verdict. In the alternative, United argued that if no directed verdict was granted, "the only other plausible interpretation" was that the dismissal was pursuant to section 581(d), which United viewed as an involuntary dismissal. Later, in supplemental briefing invited by the trial court, United declined to apportion its requested fees between the Mulitzes' claims and the claims contained in the

40

FACC.

The trial court denied the fee request on several grounds.  In ruling, the court observed that nothing established that the intended assignment of the FACC's claims to Laura and Tom -- as described in the settlement -- had, in fact, occurred.  Regardless of the identity of the owner of the FACC's claims, however, the court determined that United was not the prevailing party on the contract, concluding that Laura and Tom had prevailed on their breach of contract claim based on L.A. Stucco's contract with Building Dreams.  In addition, relying on section 581(e), the court determined that the FACC had been voluntarily dismissed without prejudice, stating:  "Under the unique circumstances of this case . . . there is 'good cause' for this court to find . . . that the dismissal . . . was not with prejudice . . . ."  In so concluding, the court stated that it had never ruled on United's motion for a directed verdict.  The court also found there was insufficient evidence that United had incurred any fees in litigating the FACC's claims, noting United's failure to assist the court in apportioning United's fees between the Mulitzes' claims and the FACC's claims.

### 3.  *Analysis*

In our view, United has shown no error in the trial court's ruling.  As explained below, to the extent United sought a fee award as the prevailing party on the contractual claims in the FACC under Civil Code section 1717, the record supports the court's determination that the FACC was voluntarily dismissed at trial.  Furthermore, to the extent United sought a fee award as the prevailing party on the noncontractual claims in the FACC, United has forfeited any contention of error.

Our inquiry into the determination regarding a voluntary dismissal has a

41

narrow focus. On appeal, "[w]e do not review the trial court's reasoning, but rather its ruling." (*J.B. Aguerre, Inc. v. American Guarantee & Liability Ins. Co.* (1997) 59 Cal.App.4th 6, 15.) Thus, we may affirm the trial court's decision "on any basis presented by the record whether or not relied upon by the trial court." (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1.) Furthermore, it is unnecessary to examine the determination that the dismissal was without prejudice, as that aspect of the ruling is irrelevant to the propriety of the fee award.

We conclude that the record establishes a voluntary dismissal under section 581(d). Under that provision, a voluntary dismissal "must be predicated upon a clear, unequivocal and express intent to abandon an action. Such intent must be demonstrated to the court by way of a motion to dismiss, stipulation of the parties or some other form of express intent on the record." (*Kaufman & Broad Bldg. Co. v. City & Suburban Mortg. Co.* (1970) 10 Cal.App.3d 206, 213.)

Although the record does not conclusively show that the assignment described in the settlement occurred, it establishes that Building Dreams and the Mulitzes each intended to abandon any claims they might assert through the FACC. In the settlement filed with the court, Building Dreams expressly stated that it "will assign" the FACC's claims to Laura and Tom. That statement expressed Building Dreams's intent not to further litigate those claims, as "once the transfer [of a claim] has been made, the assignor lacks standing to sue on the claim." (*Johnson*, *supra*, 111 Cal.App.4th at p. 1095.) Indeed, as the trial court noted, Building Dreams did not appear at trial to litigate them. Furthermore, when United directed the trial court's attention to the FACC, the Mulitzes' counsel acknowledged that they had not attempted to litigate the claims, and agreed that it should be dismissed. Because Building Dreams and the Mulitzes manifested an

42

express intent to abandon the FACC on the record, the trial court correctly concluded that there was a voluntary dismissal of the FACC.[8]  For that reason, the trial court properly denied United's fee request, insofar as it sought fees as the prevailing party on the FACC's contract-based claims under Civil Code section 1717.[9]

United suggests that the trial court's determination regarding the existence of a voluntary dismissal constituted an improper modification of the judgment, which stated that the FACC had been dismissed "based on Building Dreams['s] failure to appear."  We disagree.  Generally, "[t]he same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing.  [Citation.]"  (*Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205.)  "If a court order or judgment admits of two constructions, that one will be adopted which is consistent with the judgment required by the facts and the law of the case."  (*Graham v. Graham* (1959) 174 Cal.App.2d 678, 686.)  Thus, "'whe[n] it appears that an ambiguity is the result of oversight and inadvertence, "the judgment as entered should be liberally construed

---

[8]    We recognize that on appeal, Building Dreams has expressly refrained from arguing that there was a voluntary dismissal of the FACC.  However, because Building Dreams noticed no appeal, we must disregard any potential challenge it may raise to the trial court's ruling.  (*In re Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439.)

[9]    *D & J*, *supra*, 176 Cal.App.3d 1191, upon which United relies, is inapposite.  There, the plaintiff sued the defendant solely for breach of contract.  (*Id*. at p. 1193.)  Following the commencement of trial, the plaintiff requested that the action be dismissed with prejudice.  (*Ibid*.)  After granting that request, the trial court denied the defendant's motion under Civil Code section 1717.  (*D & J*, *supra*, at p. 1193.)  Affirming the ruling, the appellate court concluded that the dismissal was voluntary.  (*Id*. at pp. 1194-1196.)  D & J thus supports no contention of error regarding the ruling at issue here.

with a view of giving effect to the manifest intent of the court.'"' [Citation]" (*Southern Pacific Pipe Lines, Inc. v. State Bd. of Equalization* (1993) 14 Cal.App.4th 42, 57, quoting *People v. Landon White Bail Bonds* (1991) 234 Cal.App.3d 66, 77.)

Viewed in light of the proceedings relating to the FACC's dismissal, the judgment must be understood to reflect the trial court's awareness that Building Dreams's nonappearance at trial was due to the settlement. As explained above, in dismissing the FACC, the trial court was fully aware of the settlement. For that reason, the judgment comports with the existence of a section 581(d) dismissal. Indeed, before the trial court, United argued that the terms of the judgment reflected such a dismissal.

We further conclude that United has forfeited any contention of error regarding the denial of fees relating to the noncontractual claims in the FACC, which fall outside the scope of Code of Civil Procedure, as United has offered no argument regarding that aspect of the ruling. (*Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 138-139.) Furthermore, we would reject that contention were there no forfeiture, in view of the trial court's conclusion that there was no evidence that United incurred fees independently attributable to the claims in FACC. In view of that determination, nothing would support a fee award relating to the noncontractual claims in the FACC. In sum, United has established no error in the denial of its fee request.

## DISPOSITION

The judgment and orders of the court are affirmed.  Respondents are awarded their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.