[Nos. B149093, B152364. Second Dist., Div. Four. Aug. 27, 2002.]

ROBERT K. WHITESIDE, Plaintiff and Appellant, v.
TENET HEALTHCARE CORPORATION et al., Defendants and
Respondents.

694

**COUNSEL**

Gianelli & Morris, Robert S. Gianelli and Sherril Nell Babcock for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Gail E. Lees and Christopher D. Dusseault for Defendants and Respondents.

---

**OPINION**

**VOGEL (C. S.) P. J.—**

### INTRODUCTION

In the first of these consolidated appeals, plaintiff Robert K. Whiteside appeals from summary judgment granted in favor of defendants Tenet Healthcare Corporation and its related entities (collectively Tenet). Whiteside sued Tenet, the entity which owns and operates a hospital at which Whiteside received medical treatment, claiming that Tenet breached its admissions agreement with Whiteside and also its agreement with Whiteside's health insurance company, by accepting an additional payment from another insurer with whom Whiteside holds a group health insurance policy.[1] Because we conclude the contracts at issue specifically allowed Tenet to accept payment from other insurers, and because Tenet's actions are permitted by California law, we conclude summary judgment was properly entered. We affirm.

In the second of the consolidated appeals, Whiteside appeals from the trial court's award of contractual attorney fees in favor of Tenet. We conclude that the award of attorney fees against Whiteside was not authorized by the contract between Tenet and Whiteside's insurer. We reverse the order awarding attorney fees.

### CASE NO. B149093 FACTUAL AND PROCEDURAL BACKGROUND

Whiteside had two health insurance policies, Blue Shield of California, an individual policy, and New York Life Care (NYL Care), a group policy. Tenet had contractually agreed with Blue Shield to accept specified discounted rates for services rendered at its hospitals to Blue Shield policyholders. Tenet's Desert Hospital was a "preferred provider hospital" under Whiteside's Blue Shield policy, and pursuant to the terms of Whiteside's policy with Blue Shield he would enjoy greater benefits for using a preferred provider than he would if he used a nonpreferred provider.

Whiteside's Blue Shield policy stated: "Nothing in this Agreement shall preclude a Preferred Provider from seeking reimbursement from other third

---

[1]The matter was filed as a class action, however, the class was never certified; summary judgment was granted before the issue of class certification was decided.

party payers for the balance of his billed charges for Services rendered under this Agreement."

The agreement between Blue Shield and Tenet contained the following provisions:

"3.1: Hospital shall not collect from Blue Shield's subscribers for any services covered under the applicable subscriber contract, except for deductibles and copayments. . . ."

"6.3: Hospital is not precluded from seeking reimbursement from other third party payors; however, the liability of Blue Shield and its subscriber to Hospital for covered services shall not exceed the applicable inpatient or outpatient rate. If the subscriber is concurrently eligible for hospital benefits from another third party payor which is responsible on a 'primary' basis, then Blue Shield as a 'secondary' or 'tertiary' payor will pay for covered hospital services on the basis of the usual billing rate charged the majority of patients at the Hospital . . . ."

Whiteside was treated at Desert Hospital in December 1998. Before receiving treatment, he signed a document entitled "Conditions of Services." It stated in paragraph 7, entitled "Financial Obligations," "The undersigned agree(s), that in return for the services to be rendered for the patient, the undersigned hereby individually obligates himself/herself to pay the account of the hospital in accordance with the regular rates and terms of the hospital. However, if the patient is eligible to receive benefits under a health care service plan with which this hospital has contracted, the patient shall not be obligated to pay for services covered under the plan which are paid for pursuant to the contract. . . ."

Paragraph 8, entitled "Assignment of Insurance or Health Plan Benefits to Hospital" states: "The undersigned assigns and hereby authorizes, whether he/she signs as agent or as patient, direct payment to the hospital of all insurance and plan benefits otherwise payable to or on behalf of the patient for this hospitalization or for these outpatient services, including emergency services if rendered, at a rate not to exceed the hospital's regular charges. It is agreed that payment to the hospital pursuant to this authorization by an insurance company or health plan shall discharge said insurance company or health plan of any and all obligations under the policy to the extent of such payment. It is understood by the undersigned that he/she is financially responsible for charges not covered by this assignment."

Whiteside incurred regular medical service charges of $3,032.31. Pursuant to its agreement with Tenet, Blue Shield paid Tenet $1,090 for the medical

services provided to Whiteside; the customary charge was reduced by $1,942.31 under the Blue Shield agreement with Tenet.

Whiteside then apparently submitted to NYL Care a statement from Tenet listing the full amount of hospital services incurred by Whiteside, $3,032.31. Portions of the statement under the headings "payer" and "provider no." were redacted, and a handwritten notation reads: "Pay Patient." NYL Care, evidently under the terms of its own contract with Tenet, paid directly to Tenet $2,183.26 for the medical services rendered to Whiteside.[2] When Whiteside complained, Tenet refunded to Whiteside $240, the difference between the combined amounts paid to Tenet by NYL Care and Blue Shield and the total amount of the bill.

Whiteside then filed the present action against Tenet, alleging causes of action for breach of third party beneficiary contract, breach of contract, conversion, money had and received, and violation of the Unfair Competition Act (Bus. & Prof. Code, § 17200). In essence, he contends that Tenet agreed to accept as payment in full the amount of insurance proceeds paid to it by Blue Shield, and that Tenet was not entitled to keep the insurance proceeds paid to it by NYL Care. He characterizes Tenet's acceptance of payment from both insurers as a "coordination of benefits," which he argues is prohibited by California law.

Tenet moved for summary judgment, contending that its actions were fully supported by the contracts entered into between Tenet and Blue Shield, and between Tenet and Whiteside, and were not prohibited by law. Whiteside filed opposition.

After hearing argument, the trial court granted summary judgment in favor of Tenet, concluding that Tenet's actions were not prohibited and were expressly allowed under the contracts at issue.

This appeal followed.

### B149093 DISCUSSION

 Whiteside contends this case concerns the practice of " 'balance billing,' where a hospital takes money from a health plan with whom it agreed to accept a discount rate as payment in full, but then bills the

---

[2]In support of its motion for summary judgment, Tenet submitted the declaration of Stephen M. Warford, an employee of Tenet, in which Warford stated NYL Care contracted with Desert Hospital under a Private Healthcare Systems, Ltd. agreement, whereby NYL Care was obligated to pay discounted rates directly to Desert Hospital for the medical services that Desert Hospital provides to NYL Care's subscribers.

'balance' of its regular charges to the patient. The hospital does this despite the [*sic*] gaining the patient's patronage, and that of many others, by advertising itself as a 'preferred provider' to whom patients will owe nothing more beyond that paid by the health plan." He argues that Tenet improperly "balance-billed" his "second, non-coordinating health plan, an asset owned by the patient." We disagree with Whiteside's characterization of the case, and conclude that Tenet neither engaged in "balance billing," nor retained insurance proceeds to which it was not entitled.

■　The term "balance billing" is ordinarily used to refer to a situation in which a provider of medical services accepts payment from Medi-Cal and then seeks to recover the balance of its customary charges from the patient (see, e.g., *Serafini v. Blake* (1985) 167 Cal.App.3d Supp. 11 [213 Cal.Rptr. 207] [statutorily prohibited]), or when a provider of medical services asserts a lien on a patient's recovery in tort against a third party who is responsible for the patient's injuries (see, e.g., *Swanson v. St. John's Regional Medical Center* (2002) 97 Cal.App.4th 245 [118 Cal.Rptr.2d 325] [statutorily permitted]).　■　Here, Whiteside contends that Tenet agreed to accept Blue Shield's payment as payment in full, and that Tenet's acceptance of payment from NYL Care was equivalent to taking the money directly from Whiteside and was in practical effect balance billing. Whiteside's argument fails because Tenet did not contractually agree to accept Blue Shield's payment as payment in full where other insurance existed, and because Whiteside's implicit assumption that he was entitled to receive payment directly from NYL Care is unsupported.[3]

Whiteside also contends that his two insurance policies were "non-coordinating," and that by accepting payment from both policies Tenet accepted coordinating payment of benefits when to do so was not permitted. ■　"In a generic sense, 'coordination of benefits' refers to any provision in a disability policy that reduces, excludes, or adjusts benefits payable under the policy when other benefits from other sources are available to the insured for the same losses. However, the term also refers to specific uniform optional provisions found in group disability policies that allow the insurer to reduce

---

[3]In moving for summary judgment, Tenet presented evidence in the form of a declaration that indicated NYL Care had contracted with Tenet to pay Tenet directly. (See fn. 1, *ante*.) Whiteside did not present any evidence, such as his NYL Care insurance policy, showing NYL Care promised him to do otherwise and pay him directly. The Insurance Code certainly permits insurers to contract to make payments due under group health insurance policies directly to the provider of hospital and medical services (see Ins. Code, §§ 10133, 10133.7, & 10350.9), and Whiteside presented no triable issue of material fact to show NYL Care was required to make payment directly to him. Indeed as we will discuss, we interpret the applicable contracts to mean that he assigned any right to receive payments from NYL Care over to Tenet.

benefits payable under the policy when the insured has other coverage available for the same losses." (3 Cal. Insurance Law & Practice (2002) § 26.10[1], p. 26-66 (rel. 23-1/95).) "Group disability policies may provide that benefits payable under the policy are subject to reduction if the individual covered has any other coverage (other than individual policies) providing hospital, surgical, or medical benefits that would result in the insured being eligible for more than 100 percent of the covered expenses. Under permissible coordination of benefits provisions, if an insured has multiple coverages (other than individual policies) the various policies are permitted to coordinate with one another and with other sources of payment, so that the insured does not receive more than 100 percent of the covered charges. Health care service plans are also subject to these requirements, with some exceptions." (*Id.*, § 26.10[3], p. 26-67, fns. omitted, citing Ins. Code, § 10270.98.)[4]

■ Whiteside is correct that, pursuant to Insurance Code section 10270.98, his NYL Care group policy was not permitted to coordinate benefits since his Blue Shield policy was an individual policy. They are both primary policies and neither acts as secondary insurance to the other. Based on the undisputed facts before us, we readily conclude that no coordination of benefits occurred here. Both policies paid in full the amounts they contractually agreed to pay for the services provided to Whiteside. In fact, the excess amount remaining after Tenet's customary charges were satisfied was given to Whiteside. No reduction of benefits occurred here, and thus no impermissible coordination of benefits occurred.

■ We next discuss the various contracts at issue here: Whiteside's Blue Shield policy, the agreement between Blue Shield and Tenet, and the Conditions of Services agreement between Whiteside and Tenet. ■ "Insurance policies are contracts. As such, they are interpreted in the first instance by the rules of construction applicable to contracts. Under standard rules of contract interpretation, the mutual intent of the parties at the time the contract was formed governs its construction. (Civ. Code, § 1636.) So far as possible, we must infer that intent solely from the written provisions of the contract. (Id., § 1639.)" (*Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 456 [54 Cal.Rptr.2d 811].) Ambiguous language in an insurance policy is construed against the insurer and in favor of coverage, if the ambiguity cannot be resolved under more general rules

---

[4]Insurance Code section 10270.98 provides in relevant part: "Group disability policies may provide, among other things, that the benefits payable thereunder are subject to reduction if the individual insured has any other coverage (other than individual policies or contracts) providing hospital, surgical or medical benefits, whether on an indemnity basis or a provision of service basis, resulting in such insured being eligible for more than 100 percent of the covered expenses."

governing the interpretation of contracts. (See *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].) "On the other hand, where the express provisions of an insurance contract are unambiguous, the 'clear and explicit' meaning of those provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation, unless 'used by the parties in a technical sense, or unless a special meaning is given to them by usage . . . .' " (*Borg v. Transamerica Ins. Co., supra*, at p. 456, citations omitted.) We are not bound by the trial court's interpretation of the policy language, but must make our own independent interpretation. (*Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, 1118 [44 Cal.Rptr.2d 272].)

The agreement between Blue Shield and Tenet provided that "Hospital shall not collect or attempt to collect from Blue Shield's subscribers for any services covered under the applicable subscriber contract, except for deductibles and copayments." Whiteside relies on this language to argue that Tenet was contractually bound to accept only payment from Blue Shield, and could not collect the proceeds of the NYL Care policy because doing so was equivalent to collecting from Whiteside. Whiteside, however, has not shown that he was entitled to direct payment of the amount due under his NYL Care policy. To the contrary, NYL Care was obligated to pay Tenet. Whiteside's citation of irrelevant authority notwithstanding, the insurance proceeds were not an asset legally equivalent to money in a bank account or a life insurance policy owned by Whiteside.

Whiteside's Blue Shield policy plainly stated: "Nothing in this Agreement shall preclude a Preferred Provider from seeking reimbursement from other third party payers for the balance of his billed charges for Services rendered under this Agreement." Similarly, the Blue Shield/Tenet agreement explicitly stated that "Hospital is not precluded from seeking reimbursement from other third party pay[e]rs; however, the liability of Blue Shield and its subscriber to Hospital for covered services shall not exceed the applicable inpatient or outpatient rate." Whiteside does not address the clear effect of this unambiguous language, other than to argue that the language in the Blue Shield/Tenet agreement addressed only a situation where two coordinating insurance policies apply. He bases this argument on the fact that the above quoted language was followed in the same paragraph by the following language: "If the subscriber is concurrently eligible for hospital benefits from another third party pay[e]r which is responsible on a 'primary' basis, then Blue Shield as a 'secondary' or 'tertiary' pay[e]r will pay for covered hospital services on the basis of the usual billing rate charged the majority of patients at the Hospital . . . ." We disagree that the language applies only to coordinating benefits.

The first sentence of the paragraph clearly states that Tenet may seek reimbursement from other third party payers. It could have (as it does in the next sentence), but does not, limit the definition of third party payers to those payers with whom the Blue Shield policy can coordinate benefits. The remainder of the paragraph explains the procedures to be used when coordination of benefits occurs, but that in no way limits the scope of the language in the first sentence. Both Whiteside's Blue Shield policy and the Blue Shield/Tenet agreement plainly state that Tenet may seek reimbursement from third party payers, such as NYL Care.

■ In addition, the Conditions of Services agreement signed by Whiteside on the day hospital services were rendered, supports the summary judgment in favor of Tenet. Under "Financial Obligations" it states: "[I]f the patient is eligible to receive benefits under a health care service plan with which this hospital has contracted, the patient shall not be obligated to pay for services covered under the plan which are paid for pursuant to the contract. . . ." Whiteside argues that this language, similar to language in the Blue Shield/Tenet agreement, means that Tenet was contractually bound to accept only payment from Blue Shield, and could not receive payment from the NYL Care policy because doing so was equivalent to obligating him to pay for services. As we have stated, the two are not equivalent. Whiteside was eligible to receive benefits from NYL Care, with whom Tenet had contracted, in the form of payment by NYL Care to the hospital; Whiteside was not entitled to receive the monetary equivalent of the hospital benefits paid for by NYL Care.

Finally, paragraph 8 of the Conditions of Services agreement, "Assignment of Insurance or Health Plan Benefits to Hospital" states: "The undersigned assigns and hereby authorizes . . . *direct payment to the hospital of* **all** *insurance and plan benefits* otherwise payable to or on behalf of the patient for this hospitalization or for these outpatient services, including emergency services if rendered, at a rate not to exceed the hospital's regular charges." (Boldface and italics added.) Thus, even if Whiteside's NYL Care policy required NYL Care to pay him directly, he then assigned to Tenet the right to receive direct payment of insurance benefits.

Whiteside contends that this language, particularly the phrase "otherwise payable," is an attempt to cancel out the promise made in the preceding paragraph of the conditions of services agreement that a patient eligible to receive benefits under a health care service plan which contracts with Tenet will not be obligated to pay for services covered under the plan which are

paid for pursuant to the contract.[5] It does not. Whiteside was eligible to receive benefits (in the form of direct payment to the hospital) from two insurers that contract for discounted rates with Tenet, and Tenet did not seek to obligate *him* to pay for services covered by either insurer. He explicitly authorized direct payment to the hospital of all insurance and plan benefits otherwise payable to him or on his behalf.

Even viewing the Conditions of Services agreement as a contract of adhesion, and subjecting it to close scrutiny, we reach the same result.[6] The assignment clause, and the applicable contracts taken as a whole, do not defeat the reasonable expectation of insureds who choose to use preferred providers. Such insureds benefit substantially when using a preferred provider. Under the Blue Shield policy here, if an insured uses a nonpreferred provider, he or she would be obligated to pay the difference between the rate Blue Shield specifies it will pay for nonpreferred provider's services and the amount of the hospital's customary charges; some nonpreferred providers' services are not covered at all; and use of nonpreferred providers substantially increases the calendar year deductible. Whiteside's notion that by having dual coverage he could "pocket" the money from his group policy every time he had a claim that was covered by his personal insurer is simply not a reasonable expectation. He either ignores or misapprehends the provisions of his insurance policies regarding the payment of claims. The basic obligation of the medical insurers is to pay the medical providers directly for their services and to insulate the insured from any monetary obligation for such medical care. Whiteside is entitled to no more than that under the terms of his coverage.

The case heavily relied upon by Whiteside, *Nahom v. Blue Cross & Blue Shield of AZ* (1994) 180 Ariz. 548 [885 P.2d 1113], is entirely distinguishable from this case based on the contract language at issue there. In that case, the agreement between the insurer and the hospital stated that the hospital agreed to accept the negotiated amount " 'as payment *in full* for covered services performed for subscriber.' " (*Id.* at p. 1118.) In contrast here, the Blue Shield/Tenet agreement expressly stated that the hospital was not precluded from seeking reimbursement from third party payers.

---

[5]Whiteside contradicts himself in his reply brief by arguing that "otherwise payable" are words of limitation, not expansion. We interpret the sentence expansively to mean the insured/patient assigns to the hospital the right to direct payment of all benefits payable on behalf of the patient, whether due under a health care service plan with which Tenet contracts, or otherwise.

[6]Whiteside was well aware of the assignment clause. On a previous visit to Desert Hospital, he modified it by crossing out "any insurance" and writing in "Blue Cross only," and "assignment pertains to Blue Cross only."

Whiteside concedes that summary adjudication in favor of Tenet on his causes of action for breach of third party beneficiary contract, breach of contract, conversion, and money had and received is proper if the contracts at issue are interpreted as Tenet urges. He contends, however, that his cause of action for violation of the Unfair Competition Act (Bus. & Prof. Code, § 17200) survives if the contract at issue, though legal, is presented in such a manner as to confuse consumers. Suffice it to say that we find nothing in the Conditions of Services agreement that would be likely to mislead a consumer such as Whiteside. Its language was clear and reasonable. It was Whiteside's expectation regarding the advantage of having a second insurance policy that he would receive direct payment of the proceeds of his group insurance policy when that policy apparently stated to the contrary. Moreover, he assigned his alleged "right" to direct payment to Tenet.

### B152364 FACTUAL AND PROCEDURAL BACKGROUND

Tenet filed a motion to collect attorney fees in the amount of $144,719. The fee request was later adjusted to $141,529.

Whiteside argued the motion was untimely, that the attorney fees provision in the Blue Shield/Tenet agreement did not apply to him, that the Conditions of Services agreement waived Tenet's right to attorney fees by limiting such fees to collection disputes over delinquent payments, and that the amount of fees sought was unreasonable.

Tenet sought additional fees of $39,840 for expenses incurred in pursuing the motion to collect attorney fees. Whiteside objected to the further request for fees.

On July 13, 2001, the trial court granted Tenet's motion for attorney fees, but took under submission the amount to be awarded. On July 24, 2001, the court issued a minute order awarding Tenet attorney fees of $145,809.99.

Whiteside filed a notice of appeal on August 3, 2001, from the court's July 24, 2001, final order granting fees and costs.

■ An order awarding attorney fees is separately appealable as an order after judgment. (*Sessions Payroll Management, Inc. v. Noble Construction Co.* (2000) 84 Cal.App.4th 671, 677 [101 Cal.Rptr.2d 127].)

### B152364 DISCUSSION

Tenet points out that Whiteside did not appeal from the May 16, 2001, order denying his motion to tax costs or the July 13, 2001, order determining

Tenet was contractually entitled to attorney fees and taking under submission the amount of fees to be awarded. Whiteside only specified in his notice of appeal the minute order of July 24, 2001, which Whiteside refers to as "the final order granting fees and costs to defendant," in which the trial court specified the amount of attorney fees to be awarded. We liberally construe the notice of appeal to encompass review of both the determination that Tenet is contractually entitled to attorney fees, and the amount of the fees awarded. (Cal. Rules of Court, rule 1(a)(2).) ■ We review de novo the legal determination that Tenet is entitled to recover attorney fees pursuant to contract. (*Sessions Payroll Management, Inc. v. Noble Construction Co., supra,* 84 Cal.App.4th 671, 677.)

■ Code of Civil Procedure section 1033.5, subdivision (a)(10)(A) states that attorney fees are recoverable within the statutory definition of costs when authorized by contract or statute. The issue before us is whether the attorney fees provision in the Blue Shield/Tenet agreement supports the award of attorney fees against Whiteside, a nonsignatory to that contract, but a third party beneficiary of the agreement.

Civil Code section 1717, subdivision (a) states, in relevant part: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs."

Section 17 of the Blue Shield/Tenet agreement is entitled "Arbitration/ Attorney's Fees." Paragraph 17.1 provides that "[d]isputes between Blue Shield and Hospital arising out of this Agreement shall be resolved by arbitration." The next paragraph, 17.2, states: "If proceedings are necessary to enforce this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees in addition to any other relief it may obtain."

The Supreme Court has held that Civil Code section 1717 must be interpreted to provide a reciprocal remedy for a nonsignatory defendant sued on a contract as if he were a party to it, when a plaintiff would clearly be entitled to attorney fees should he prevail in enforcing the contractual obligation against the defendant. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 128-129 [158 Cal.Rptr. 1, 599 P.2d 83].) Likewise, in an action involving a nonsignatory who sued to enforce a contract as a third party beneficiary, an appellate court, relying on *Reynolds Metals*, held: "A party is entitled to recover its attorney fees pursuant to a contractual provision only

when the party would have been liable for the fees of the opposing party if the opposing party had prevailed. Where a nonsignatory plaintiff sues a signatory defendant in an action on a contract and the signatory defendant prevails, the signatory defendant is entitled to attorney fees only if the nonsignatory plaintiff would have been entitled to its fees if the plaintiff had prevailed." (*Real Property Services Corp. v. City of Pasadena* (1994) 25 Cal.App.4th 375, 382 [30 Cal.Rptr.2d 536].)

In *Real Property*, the contract at issue was a lease which stated that the lessor consented to the sublease of the premises by the lessee, and specifically named Real Property Services Corp. (RPS) as sublessee. RPS was not a signatory to the lease. The lessor later terminated the lease, and the lessee acquiesced in the termination. RPS, however, sued the lessor for breach of contract and sought attorney fees. The trial court entered judgment for the lessor, finding the termination of the lease also terminated the third party beneficiary rights of RPS, but denied the lessor's motion for attorney fees.

The Court of Appeal reversed the trial court's order denying the lessor's motion for attorney fees. In so doing, the court relied on "settled law that 'if a lessor has expressly agreed to a sublease, the sublessee is a third party beneficiary to the implied covenant of quiet enjoyment in the original lease and has the right to go directly against the lessor for its breach.' [Citation.] Where there is a sufficient nexus between the lessor and sublessee, a nonsignatory sublessee is entitled to enforce an attorney fee provision in the lease as a third party beneficiary against a signatory landlord. [Citations.]" (*Real Property Services Corp. v. City of Pasadena, supra,* 25 Cal.App.4th at p. 383.)

In this case, we do not find there to be a sufficient nexus between Tenet and Whiteside such that Whiteside would be entitled to enforce, as a third party beneficiary, the attorney fee provision in the Blue Shield/Tenet agreement. While Blue Shield subscribers are mentioned within the portions of the Blue Shield/Tenet agreement having to do with "patient care evaluation, utilization and payment," it is clear that subscribers are not third party beneficiaries with regard to the entirety of the contract.

 "A third party beneficiary may enforce a contract made expressly for his or her benefit. [Citation.] It is also true that a party not named in the contract may qualify as a beneficiary under it where the contracting parties must have intended to benefit the unnamed party and the agreement reflects that intent. [Citation.] The party claiming to be a third party beneficiary bears the burden of proving that the contracting parties *actually promised the performance which the third party beneficiary seeks*. This remains largely a

question of interpreting the written contract. [Citation.]" (*Sessions Payroll Management, Inc. v. Noble Construction Co., supra,* 84 Cal.App.4th 671, 680, italics added.) We note that in his complaint Whiteside did not claim entitlement to an award of attorney fees pursuant to the Blue Shield/Tenet agreement in the event he prevailed against Tenet.

" 'A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him. [Citations.] As to any provision made not for his benefit but for the benefit of the contracting parties or for other third parties, he becomes an intermeddler. Permitting a third party to enforce a covenant made solely to benefit others would lead to the anomaly of granting him a bonus after his receiving all intended benefit.' [Citation.]" (*Sessions Payroll Management, Inc. v. Noble Construction Co., supra,* 84 Cal.App.4th at p. 680.)

Whiteside was entitled to benefit from the Blue Shield/Tenet agreement as it pertained to payment for hospital services on his behalf. The contract in no way indicates, however, that the signatories intended the attorney fees provision to benefit or obligate Blue Shield subscribers. Indeed, to the extent the agreement contemplates actions between subscribers and Tenet, it provides in paragraph 5.1: "Nothing contained in this Agreement requires Hospital to arbitrate or otherwise handle in any particular manner or dispose of any claim or action (malpractice or otherwise) by a patient against Hospital arising out of services performed by Hospital." Thus, Hospital disclaimed any obligations with regard to its handling of legal matters arising between it and Blue Shield subscribers, whereas elsewhere it had agreed to arbitrate disputes between it and Blue Shield and that the prevailing party in proceedings to enforce the agreement would be entitled to attorney fees.

We conclude that if Whiteside, a nonsignatory, had prevailed in this matter in claiming that Tenet breached its contract with Blue Shield, Whiteside would not have been entitled to recover attorney fees incurred in enforcing the agreement pursuant to the attorney fees provision therein. Likewise Tenet, the signatory defendant, is not entitled to an award of attorney fees.

Because we conclude that the award of attorney fees against Whiteside was not authorized by contract and therefore reverse the attorney fees award, we need not address the issue of whether the motion for attorney fees was timely.

## DISPOSITION

The judgment in favor of Tenet is affirmed. The order awarding attorney fees against Whiteside is reversed. Each side is to bear its own costs on these appeals.

Epstein, J., and Curry, J., concurred.

A petition for a rehearing was denied September 24, 2002, and appellant's petition for review by the Supreme Court was denied December 11, 2002.