Filed 10/26/21  Dameron Hospital Assn. v. Geico Casualty CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>GEICO CASUALTY COMPANY,<br><br>Defendant and Respondent. | C086546<br><br>(Super. Ct. No. STKCVUOCT20140010826)<br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on October 4, 2021, be modified as follows:

On page 13 in the last paragraph following the word "benefits," the parenthetical phrase "(which are personal assets of the patient)" is deleted.

The petition for rehearing is denied.

1

There is no change in the judgment.

BY THE COURT:

_____
RAYE, P. J.


_____
HULL, J.


_____
MAURO, J.

Filed 10/4/21  Dameron Hospital Assn. v. Geico Casualty CA3 (unmodified opinion)

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| DAMERON HOSPITAL ASSOCIATION, | C086546 |
| Plaintiff and Appellant, | (Super. Ct. No. STKCVUOCT20140010826) |
| v. | |
| GEICO CASUALTY COMPANY, | |
| Defendant and Respondent. | |

SUMMARY OF THE APPEAL

Dameron Hospital Association (Dameron) brought an action against Geico Casualty Company (Geico) in which Dameron alleged Geico improperly ignored and refused to honor an assignment of uninsured motorist benefits to Dameron contained in Conditions of Admission (COAs) signed by a patient when Dameron provided the signatory and his daughter emergency medical treatment.  Though the Patients' health insurance provider had provided Dameron payment for the emergency services pursuant to an agreement between Dameron and the health insurance provider, Dameron wanted to

1

recoup a greater payment for its emergency services from Geico. Geico successfully brought a motion for summary judgment to dispose of the action, and the trial court entered judgment in Geico's favor. On appeal, we affirm the trial court's order and judgment on two separate grounds. First, any purported assignment of the uninsured motorist benefits contained in the COAs would be void as contrary to public policies reflected in laws designed to protect patients with health insurance from unexpected financial obligations to providers of emergency medical care. Second, the purported assignment language contained in the COAs cannot reasonably be interpreted, under the facts of this case, to entitle Dameron to recoup additional payments for its services from the Patients' uninsured motorist benefits because the assignment constituted a contract of adhesion.

We affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

### The Patients' Admission to Dameron

In May 2009, W.H. and his daughter, H.H., (together referred to as the Patients) were injured in a motor vehicle accident and taken to Dameron for treatment. The driver of the other vehicle was uninsured. According to Dameron, once W.H. was stable, Dameron asked W.H. to sign one COA for himself and one for H.H. He signed the COAs.

Paragraph 1 of the COA was labeled "CONSENT AND AGREEMENT TO MEDICAL AND SURGICAL PROCEDURES" and included the following language: "[t]he undersigned assigns to the hospital indicated and the physician(s) any insurance benefits due the patient or insured because of the hospital and medical services, and authorize payment directly to them."

In paragraph 3, the patient or patient's representative agreed to "pay the account of the hospital in accordance with the regular rates and terms of the hospital."

2

Paragraph 8 of the COA was labeled "ASSIGNMENT OF INSURANCE BENEFITS" and included the following language: "[t]he undersigned authorizes, whether he/she signs as an agent or as patient, direct payment to the hospital and the physicians specifically associated with the patient's medical care, of any insurance benefits otherwise payable to or on behalf of the undersigned for this hospitalization or for those outpatient services, outpatient observation care, including emergency services if rendered, at a rate not to exceed the provider's regular charges. It is agreed that payment to the hospital, pursuant to this authorization, by an insurance company shall discharge said insurance company of any and all obligations under a policy to the extent of such payment. It is understood by the undersigned that he/she is financially responsible for charges not covered by this agreement."

According Craig Haupt, who has served as Dameron's Credit & Collections Manager since 1989, "[a]ll patients are required to sign the COA, or to have the COA signed on their behalf, before the patient leaves the hospital. In rare cases, injured patients may leave the hospital without signing the COA, and without a family member signing on their behalf. This oversight does not excuse patients from signing the COA, and their failure to sign the COA does not change the terms and conditions under which all patients at Dameron are treated." Haupt believes a family member's signature can bind a patient, in part, because COAs are "contracts of necessity."

*Dameron's Agreement with the Patients' Health Insurer and Payments Made Under that Agreement*

At the time of the auto accident, the Patients had medical coverage under the Kaiser Foundation Health Plan (Health Plan).

In 1995, Dameron entered into an agreement with Kaiser Foundation Hospitals and the Permanente Medical Group, Inc. (Kaiser Hospitals) for the provision of hospital services (the Kaiser/Dameron Agreement). Dameron and Kaiser Hospitals amended the

3

Kaiser/Dameron Agreement in early 2009, before the Patients were treated at Dameron. As described in the agreement, the Health Plan operated a "prepaid group practice health care service plan that provides or arranges for the provision of" medical services to its members. In turn, the Health Plan had entered into an agreement with Kaiser Hospitals in which Kaiser Hospitals agreed to "provide or arrange for all medically necessary hospital services" for members.

One category of services the Kaiser/Dameron Agreement contemplated Dameron would provide members is medically necessary services, "as immediately required because of unforeseen illness or injury"--i.e., emergency services. Section V of the Kaiser/Dameron Agreement governed billing and payments for Dameron's services to Kaiser members. It indicated that Kaiser would pay Dameron for services provided in accord with section V and Exhibit A to the contract. According to section V, Dameron was to "look solely to Kaiser Permanente (or another responsible payer) for compensation for Hospital Services rendered to Members under this Agreement, and, except as expressly provided in this Section, Hospital agrees that in no event, including but not limited to nonpayment by Kaiser Permanente, insolvency or breach of this Agreement, shall Hospital bill, charge, collect a deposit from, seek compensation, remuneration, or reimbursement from, or have any recourse against any Member for Hospital Services provided pursuant to this Agreement. Hospital further agrees that this provision shall (i) survive the termination of this Agreement regardless of the cause giving rise to termination and shall be construed to be for the benefit of Members, and (ii) supersede any oral or written contrary agreement now existing or hereafter entered into by the parties."

The incidents in which the Kaiser/Dameron Agreement contemplated Dameron might seek compensation from entities other than Kaiser included the collection of copayments and deductibles pursuant to the member's agreements with Kaiser, payments for services not allowed for or for which the member was not entitled to a benefit under

4

their agreement with Kaiser, or services provided under Medicare. The Kaiser/Dameron agreement further stated, "Hospital understands and agrees that surcharges against Members are prohibited and Kaiser Permanente shall take appropriate action if surcharges are imposed. A surcharge is an additional fee which is charged to a Member for a covered Hospital Service but which is not approved by the Commissioner of Corporations or provided for under the applicable Membership Agreement and disclosed in the Member's evidence of coverage."

Exhibit A to the Kaiser/Dameron Agreement, as amended effective January 1, 2009, set out a rate schedule for services provided by Dameron to Kaiser members. The introductory paragraph of Exhibit A stated, "[Kaiser] will pay [Dameron] for Covered Services the rates set forth in this Exhibit A, reduced by applicable Copayments (or, in the case of Medicare Cost Members or Regular Medicare Members with respect to Medicare-covered services, Medicare coinsurance and deductible amounts only). [Dameron] will accept such amounts as payment in full for Covered Services, irrespective of the cost to [Dameron] of providing such services, or of [Dameron's] customary charges for such services."

Kaiser made a payment to Dameron for Dameron's treatment of the Patients. In discovery responses, Dameron asserted it will refund those payments when it receives a payment from the purported assignment of benefits. Explanations of benefits produced by Dameron in discovery reflect that while the total charge for W.H.'s treatment by Dameron was $3,657, and the total for H.H.'s treatment was $1,879.15, both amounts were subject to a contractual adjustment, reducing the payments to $911 for each patient.

### *Claims Made by the Patients and Dameron for Uninsured Motorist Benefits*

At the time of the accident, the Patients were insureds under a family automobile policy issued by Geico (the Auto Policy). The Auto Policy provided the Patients with uninsured motorist coverage. Geico's uninsured and underinsured motorist coverage

5

"will pay damages for bodily injury to an insured, caused by accident which the insured is legally entitled to recover from the owner or operator of an uninsured motor vehicle, underinsured motor vehicle or hit-and-run motor vehicle arising out of the ownership, maintenance or use of that motor vehicle. ¶ The amount of the insured's recovery for these damages will be determined by agreement, between the insured or his representative and us. The dispute will be arbitrated if an agreement cannot be reached." Bodily injury is defined in section I of the policy to mean, "bodily injury to a person, including resulting sickness, illness or death."

On or before August 5, 2009, the Patients, through an attorney, presented claims to Geico for uninsured motorist benefits. In August 2012, the Patients settled their claims, and Geico agreed to pay W.H. $34,000 and H.H. $7,500. The Patients' attorney requested that Geico issue settlement checks payable to him and his clients. Geico complied with the request.

While the Patients were negotiating the resolution of their claims for uninsured motorist benefits from Geico, in October 2011, Dameron requested Geico process billing statements for the Patients' treatment following the accident in the amount of $3,657, for W.H., and $1,879, for H.H. Dameron requested that Geico pay it for the medical services it provided the Patients at Dameron's full billing rates, which was more than twice the amount Kaiser remitted to Dameron.

In November 2012, after the Patients reached their settlement with Geico, Dameron sent a letter to Geico demanding the lesser of (1) the amount of uninsured motorist benefits paid to the Patients or their attorney; or (2) $5,536.15, roughly the full amount Dameron had sought in its October 2011 request to Geico.

*Procedural History*

Dameron filed an action seeking an injunction, damages, and declaratory relief on October 24, 2014. As reflected in the Second Amended Complaint, the operative

6

complaint in the action, Dameron alleged that when W.H. signed the COAs on behalf of himself and H.H., he made an enforceable assignment of all first party insurance benefits that "might provide coverage for [the] hospital bills incurred for the care and treatment that [Dameron] provided" to them. Dameron alleged the assignment included "first party insurance benefits that cover the cost of hospital services that" Dameron provided the Patients. Dameron further alleged that it had provided Geico with timely notice of the assignments. Dameron alleged that Geico "violated and breached" the assignment by paying to the Patients, or a "third party other than" Dameron, money Dameron alleged was due directly to Dameron under the purported assignments in the COAs. Dameron alleged Geico's action gave rise to two causes of action. The first cause of action claimed Geico's actions violated the Unfair Business Practices Act (Bus. & Prof. Code, § 17200 et seq.), warranting a permanent injunction against Geico prohibiting Geico and its employees from "ignoring and violating" the assignments of benefits given to Dameron by Geico's insured patients. The second cause of action alleged that Geico violated the assignments by paying entities or persons other than Dameron, entitling Dameron to declaratory relief and damages.

Geico filed a motion for summary judgment. The trial court granted Geico's motion and entered judgment in its favor. Dameron filed a timely notice of appeal.

## DISCUSSION

### I

*Standard of Review*

A court must grant a motion for summary judgment when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) In moving for summary judgment, defendants had the burden to show that the cause of action has no merit because an essential element cannot be established or there is a

7

complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861.)

On appeal, we review the record and the determination of the trial court de novo, viewing the evidence in the light most favorable to plaintiffs as the losing parties. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003.) We apply de novo review to questions of law regarding statutory interpretation. (*Earl v. State Personnel Bd.* (2014) 231 Cal.App.4th 459, 462.) "We also independently review contractual agreements, including the question of whether the language used in a contract is ambiguous. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1245.)" (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 558 (*Dameron*).) "We are not bound by the trial court's reasons for granting summary judgment because we review the trial court's ruling, and not its rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878 [].)" (*Avidity Partners, LLC v. State of California* (2013) 221 Cal.App.4th 1180, 1192.)

II

*An Assignment of the Patients' Uninsured Motorist Benefits Is Contrary to Public Policy*

"The consideration of a contract must be lawful within the meaning of [Civil Code] Section 1667." (Civ. Code, § 1607.) Under Civil Code section 1667, "[t]hat is not lawful which is . . . [c]ontrary to the policy of express law, though not expressly prohibited." Here, we find that an agreement entered into between a patient receiving emergency services and the provider of those services in which the patient assigns the service provider his or her uninsured motorist benefits is unlawful within the meaning of Civil Code sections 1607 and 1667, and, therefore, void when the patient is covered by a health care service plan. (Civ. Code, § 1608.)

8

A. *Laws Governing Health Insurance Plan Payment of Emergency Medical Care*

California Health and Safety Code section 1317, subdivision (a), requires hospitals that render emergency services to provide such services upon request to any person suffering a condition "in which the person is in danger of loss of life, or serious injury or illness." The emergency service provider must provide the services regardless of the patient's, "insurance status, economic status, [or] ability to pay for medical services," and, "without first questioning the patient or any other person as to his or her ability to pay therefor." (*Id.*, subs. (b) & (d).) However, "the patient or his or her legally responsible relative or guardian shall execute an agreement to pay therefor or otherwise supply insurance or credit information promptly after the services are rendered." (*Id.*, subd. (d).)

Under the Knox-Keene Health Care Services Plan Act (Health & Saf. Code, §§ 1340-1399.864 (Knox-Keene))--which exists, in part "to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers" (Health & Saf. Code, § 1342, subd. (d))--health care service plans, or their contracting medical providers, must "reimburse providers for emergency services and care provided to its enrollees, until the care results in stabilization of the enrollee, except" as not relevant here (Health & Saf. Code, § 1371.4, subd. (b)). Also under Knox-Keene, contracts between healthcare service plans and health care providers must be in writing, and "shall set forth that in the event the plan fails to pay for health care services as set forth in the subscriber contract, the subscriber or enrollee shall not be liable to the provider for any sums owed by the plan." (Health & Saf. Code, § 1379, subd. (a).) When a contract has not been reduced to writing, or if a written contract does not have the "required prohibition, the contracting provider shall not collect or attempt to collect from the subscriber or enrollee sums owed by the plan." (Health & Saf. Code, § 1379, subd. (b).)

In *Prospect Medical Group, Inc. v. Northridge Emergency Group* (2009) 45 Cal.4th 497, 502 (*Prospect*) our Supreme Court examined this statutory scheme and considered if, when a health care service plan "submits a payment lower than the amount billed," by the emergency room service provider, "can the emergency room doctors directly bill the patient for the difference between the bill submitted and the payment received—i.e., engage in the practice called 'balance billing'?" The Court concluded that, "billing disputes over emergency medical care must be resolved solely between the emergency room doctors, who are entitled to a reasonable payment for their services, and the [health care service plan], which is obligated to make that payment. *A patient who is a member of [a health care service plan] may not be injected into the dispute*. Emergency room doctors may not bill the patient for the disputed amount." (*Ibid.*, italics added.)

Hence, it is worth observing, that if there was no assignment of the Patients' uninsured motorist benefits, Dameron would be prohibited from reaching the funds paid to the Patients under that policy to recoup the difference between its negotiated rates under the Kaiser/Dameron agreement and its regular rates by sending a bill for the balance to the Patients.

B. *The Hospital Lien Act*

With the Hospital Lien Act (Civil Code, § 3045.1 et seq.), the Legislature established one mechanism through which hospitals that provide emergency services can recoup costs from an entity other than a patient's health care service plan. Civil Code section 3045.1 states, "[e]very person, partnership, association, corporation, public entity, or other institution or body maintaining a hospital licensed under the laws of this state which furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or other wrongful act not covered by" [sections not applicable here], "shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the

10

person, or by his or her heirs or personal representative in case of his or her death to the extent of the amount of the reasonable and necessary charges of the hospital and any hospital affiliated health facility, . . . in which services are provided for the treatment, care, and maintenance of the person in the hospital or health facility affiliated with the hospital resulting from that accident or negligent or other wrongful act." An HLA lien, "shall apply whether the damages are recovered, or are to be recovered, by judgment, settlement, or compromise." (Civ. Code, § 3045.2.) The amount a hospital can collect under an HLA lien is limited to "so much thereof as can be satisfied out of 50 percent of the moneys due under any final judgment." (Civ. Code., § 3045.4.) In *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 603 (*Parnell*), our Supreme Court considered the legislative history of the HLA and observed that it "strongly suggests that a lien under the HLA requires an underlying debt owed by the patient to the hospital."

The ability of an emergency service provider to collect payment for its services under the HLA "requires the existence of an underlying debt owed by the patient to the hospital . . . , absent such a debt, no lien may attach." (*Parnell*, *supra*, 35 Cal.4th at p. 609.) Thus, when an emergency service provider enters into an agreement with a health care service plan and agrees to accept a specified amount from the plan as " 'payment in full,' " and then the health care plan provides it with a payment in the amount specified under the agreement, the emergency care provider "may not assert a lien under the HLA against [the patient's] recovery from the third party tortfeasor." (*Ibid.*) This is so, because, under the terms of the agreement, the patient's "entire debt to the hospital has therefore been extinguished." (*Ibid.*)

However, emergency care providers do not have to choose between the ability to contract with health care service plans and the ability to collect higher rates for care using the HLA. As this court concluded in *Dameron, supra,* 229 Cal.App.4th at page 554, if, "hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to

contract for this right" when negotiating their contracts with health care service providers.

In *Dameron* we "reject[ed] the contentions . . . that [Health and Safety Code] section 1379 insulates," tortfeasors' automobile insurers, "from balance billing by hospitals. Section 1379 does not mention balance billing, third party tortfeasors, or liability insurance companies. Instead, the statute mentions only health care service plans, providers of medical care, and patients. The clear import of section 1379 is to protect *patients* with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Id.* at p. 563.)

C. *Uninsured Motorist Coverage*

Uninsured and underinsured motorist policies are governed generally by Insurance Code section 11580.2, "which requires automobile liability insurers to offer insurance for damages or wrongful death caused by both uninsured and underinsured motorists." (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1053 (*Quintano*); see also Ins. Code, § 11580.2, subds. (a)(1) & (p)(7).) "The purpose of the statute is 'to protect one lawfully using the highway by assuring him of payment of a minimum amount of an award to him for bodily injury caused by the actionable fault of another driver.' (*Fireman's Fund etc. Co. v. Ind. Acc. Com.* (1964) 226 Cal.App.2d 676, 677-678 [].)" (*Hartford Fire Ins. Co. v. Macri* (1992) 4 Cal.4th 318, 324.)

Though uninsured motorist policies exist to assure persons injured in automobile accidents a minimum level of payment when their injuries are the fault of uninsured motorists, courts have emphasized that the uninsured motorist insurance provider "is the insurer of the . . . patient," not the tortfeasor or the tortfeasor's insurer. (*Weston Reid, LLC v. American Insurance Group, Inc.* (2009) 174 Cal.App.4th 940, 948-949 (*Weston*); *Haering v. Topa Ins. Co.* (2016) 244 Cal.App.4th 725, 733.) Uninsured motorist policies, " 'are not "third party" coverages. They are strictly "first party" coverages because the

insurer's duty is to compensate its own insured for his or her losses, rather than to indemnify against liability claims from others.' " (*Weston, supra*, 174 Cal.App.4th at p. 950.) This first party coverage is not reachable under the HLA. (*Ibid.*)

D. *An Assignment of the Patients' Uninsured Motorist Policies is Contrary to Law*

Here, Dameron is attempting to collect more than the payments for which it negotiated with the Patients' health care provider by pursuing funds that would come from the Patients' first-party uninsured motorist benefits. And, as part of this effort, Dameron involved W.H., by asking him--as he and his daughter sat injured in the hospital--to sign COAs that Dameron argues gave Dameron permission to pursue those funds. That is, Dameron asked W.H. to give Dameron the authority to secure from his first-party benefits under W.H.'s automobile insurance policy a payment greater than it was afforded under its agreement with Kaiser for medical services. This effort is contrary to the statutory policy of protecting patients, "with health care service plan coverage from any collection attempts by providers of such medical care as emergency room services." (*Dameron, supra*, 229 Cal.App.4th at p. 563.) For the same reason an emergency room provider cannot interject a patient into a dispute with a medical insurance provider over the reasonableness of its rates by billing the patient for the disputed amount (see *Prospect, supra*, 45 Cal.4th at p. 502) and it cannot attempt to avoid this prohibition by instead going after uninsured motorist benefits by way of a patient assignment.

Patients with medical insurance coverage expect that coverage will "insulate [them] from any monetary obligation for such medical care." (*Whiteside v. Tenet Healthcare Corp.* (2002) 101 Cal.App.4th 693, 705 (*Whiteside*).) When a medical care provider attempts to obtain a patient's uninsured motorist benefits (which are personal assets of the patient) to recoup more than what the health insurance company would

13

otherwise pay to the patient, they are attempting to take money that is intended to compensate the patient directly under appropriate circumstances.

We recognize that, in theory, a payment to a provider made under the HLA can ultimately diminish funds that go to a patient, and in *Dameron* we permitted medical service providers to recoup more than the rates they had agreed to in a contract with a health insurer, provided that the contract with the insurer allowed for it. (*Dameron*, *supra*, 229 Cal.App.4th at p. 563.)

However, Dameron's collection efforts here are markedly distinguishable. The funds potentially available through the HLA are made available via a statutorily established lien which limits the portion of the funds the hospital can collect. (See Civ. Code., § 3045.4.) Moreover, the HLA does not rely on assignments made by a patient at the hospital.

Dameron's efforts to secure the Patients' uninsured motorist benefits through an assignment contained in the COAs is contrary to patient protections created by Knox-Keene and statutes related to the provision of emergency care as summarized in *Prospect* and cannot be allowed. On this basis alone, the trial court properly granted the motion for summary judgment.

IV

*The COA Did Not Create an Enforceable Assignment of Uninsured Motorist Benefits*

In addition to the reasons stated above, we find that, under the undisputed facts here, COAs signed by W.H. cannot be enforced to assign to Dameron the Patients' uninsured motorist benefits because it was an agreement of adhesion.

"The term 'adhesion contract' refers to standardized contract forms offered to consumers of goods and services on essentially a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing in the

14

form contract." (*Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 356 (*Wheeler*).) "The distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms. [(Citations] [¶] A hospital's standard printed 'Conditions of Admission' form possesses all the characteristics of a contract of adhesion. [Citations.] As the court stated in *Tunkl v. Regents of University of California* [(1963)] 60 Cal.2d [92], 102: 'The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. . . .' " (*Wheeler*, 63 Cal.App.3d at pp. 356-357.)

Here, Dameron's own declarant indicated all Dameron patients, or their representatives, are required to sign the COAs Dameron presents to them before the patient leaves the hospital, and in the "rare" instance in which a patient or representative does not sign the form before leaving the hospital, Dameron does not consider the patient excused from signing off on the COA's terms. The COA is a contract of adhesion and we determine its enforceability accordingly.

With contracts of adhesion, "[e]nforceability depends upon whether the terms of which the adherent was unaware are beyond the reasonable expectations of an ordinary person or are oppressive or unconscionable. ' "In dealing with standardized contracts, courts have to determine what the weaker contracting party could legitimately expect by way of services according to the enterpriser's 'calling' and to what extent the stronger party disappointed reasonable expectations based on the typical life situation." ' [Citations.]" (*Wheeler*, 63 Cal.App.3d at p. 357.)

Applying these principles to the assignment language in the COAs, we find that the language was insufficient to create an enforceable assignment of the Patients' uninsured motorist benefits to Dameron.

15

Though it did not consider this precise issue, the analysis in *Whiteside, supra,* 101 Cal.App.4th 693 is helpful to our analysis here. In *Whiteside*, the Second District Court of Appeal considered whether a hospital breached its admissions agreements with a patient and his individual health insurer when, after the individual health insurer paid for the patient's service according to its agreement with the hospital, the hospital accepted an additional payment from another insurer with whom the patient held a group health insurance policy. (See *id.* at pp. 698 & 700.) The court held that both the contracts and California law permitted the hospital to collect the additional payment from the group insurer. (*Id.* at p. 698.) In finding the agreement between the patient and the hospital allowed for the payment by the group health insurer to the hospital instead of the patient, the court considered language very similar to the assignment language at issue here. (*Id.* at p. 704.) The court reasoned, "[e]ven viewing the Conditions of Services agreement as a contract of adhesion, and subjecting it to close scrutiny, we reach the same result. The assignment clause, and the applicable contracts taken as a whole, do not defeat the reasonable expectation of insureds who choose to use preferred providers. Such insureds benefit substantially when using a preferred provider. Under the Blue Shield policy here, if an insured uses a nonpreferred provider, he or she would be obligated to pay the difference between the rate Blue Shield specifies it will pay for nonpreferred provider's services and the amount of the hospital's customary charges; some nonpreferred providers' services are not covered at all; and use of nonpreferred providers substantially increases the calendar year deductible. Whiteside's notion that by having dual coverage he could 'pocket' the money from his group policy every time he had a claim that was covered by his personal insurer is simply not a reasonable expectation. He either ignores or misapprehends the provisions of his insurance policies regarding the payment of claims. *The basic obligation of the medical insurers is to pay the medical providers directly for their services and to insulate the insured from any monetary obligation for*

16

*such medical care*.  Whiteside is entitled to no more than that under the terms of his coverage." (*Id.* at p. 705, italics added, fn. omitted.)

In contrast to the health insurance benefits at issue in *Whiteside*, persons with uninsured motorist policies expect benefits to be paid directly to them to compensate them for their bodily injuries.  Furthermore, when those persons have health insurance, they expect their personal obligation to pay medical service providers will be capped with their deductibles and copayments, and that everything else will be covered by their health insurer.  Thus, even assuming they read the COA, when a patient or its representative assigns, "any insurance benefits due the patient or insured because of the hospital and medical services, and authorize payment directly to," the hospital it is reasonable and likely the patient believes that the medical insurance s/he has purchased to cover medical services is what the hospital intends to collect as a result of the assignment; not that the hospital is going to rely on this language to collect from his uninsured motorist insurer sums above and beyond the negotiated rates between the hospital and the patient's health plan service provider.

Similarly, when the patient assigns and authorizes the medical service provider to collect payments, "any insurance benefits otherwise payable to or on behalf of the undersigned *for this hospitalization or for these outpatient services, outpatient observation care*, including emergency services if rendered, at a rate *not to exceed the provider's regular charges*," the patient likely and reasonably would conclude it has simply agreed that any funds due under its health insurance plan will be directly paid to the hospital at the regular rates negotiated between the provider and the health insurance plan.  It is not reasonable to expect the patient to agree to use its uninsured motorist coverage--at a risk of diminishing the amount he or she can collect in capped uninsured motorist benefits--to subsidize higher than the negotiated payments to the hospital.  A patient with health insurance signing this COA reasonably would believe that he or she is

17

just allowing the hospital to work directly with its health insurer to collect negotiated payments.

Under these circumstances, the COAs cannot reasonably be read to contain--nor should Dameron be able to enforce a COA that calls for--an assignment of the Patients' uninsured motorist benefits that would allow Dameron to collect from Geico an additional payment for medical services, above what Dameron had negotiated as payment for services with Kaiser.

V

*Impact of Insurance Code Section 520 and* <u>*Fluor Corp. v. Superior Court*</u> *(2015) 61 Cal.4th 1175*

Numerous times throughout its briefs, Dameron argues that Insurance Code section 520; *Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175 (*Fluor*); and, to a lesser extent, *Henkel Corp. v. Hartford Accident and Indemnity Company* (2003) 29 Cal.4th 934 (*Henkel*), require Geico to accept the purported assignment of benefits contained in the COAs. Dameron's argument on this point, too, is unpersuasive.

Insurance Code section 520 states that, "[a]n agreement not to transfer the claim of the insured against the insurer after a loss has happened, is void if made before the loss except as" [not relevant here].

In *Henkel*, our Supreme Court considered whether a corporate entity that had acquired the product line of another corporate entity had "acquired the benefits of the insurance policies issued by" an insurer to the original owner of the product line "to cover lawsuits based on injuries sustained during the policy period." The Court reached its decision without considering Insurance Code section 520, and concluded "that under the circumstances of this case any assignment of benefits does require the consent of the insurers." (*Henkel*, *supra*, 29 Cal.4th at p. 938; see *Fluor*, *supra*, 61 Cal.4th at p. 1180 [noting Insurance Code section 520 was not cited in *Henkel*].) As part of its analysis, the

18

Court observed that, "each of the [insurance] policies [at issue] contained clauses providing that there could be no '[a]ssignment of interest under this policy' without the insurer's consent endorsed on the policy," and that, "[s]uch clauses are generally valid and enforceable." (*Henkel*, *supra*, 29 Cal.4th at p. 943.)

In *Fluor*, our Supreme Court revisited its *Henkel* "determination . . . regarding the enforceability of 'consent-to-assignment' clauses in third party liability insurance policies" in light of Insurance Code section 520 and concluded it "dictates a result different from that reached in *Henkel*." (*Fluor*, *supra*, 61 Cal.4th at p. 1180.) Accordingly, the Court held that a consent-to-assignment clause that read, "[a]ssignment of interest under this policy shall not bind the Company until its consent is endorsed hereon," could not operate to allow a third party liability insurer to refuse "to honor an insured's assignment of the right to invoke defense or indemnification coverage regarding" a loss that occurs within the time limits of the policy. (*Id.* at pp. 1175, 1183 & 1224.)

The issues raised here are distinguishable from the issues contemplated by *Henkel*, *Fluor*, and Insurance Code section 520. Here, we are not dealing with an insurer who refuses to accept the valid assignment of insurance benefits from one corporate entity to another. We are also not considering a scenario in which Geico wants to enforce a provision in its policies with its insureds wherein it claims it will not honor otherwise lawful assignments. We are dealing with an insurer refusing to accept an assignment that is, by its very nature, contrary to public policy. Here, Dameron wants to use the purported assignment to collect more than it would otherwise be entitled to take from the Patients under the law, to the possible financial detriment of those patients. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1275, fn. 10.)

19

## DISPOSITION

We affirm the trial court's judgment.  Respondent shall recover costs on appeal.
(Cal. Rules of Court, rule 8.278.)

                    _____

                    HULL, J.

We concur:

_____

RAYE, P. J.

_____

MAURO, J.